**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT KENTUCKY
LOUISVILLE DIVISION**

KENTUCKIANS FOR THE
COMMONWEALTH,

     *Plaintiff*,

v.

MICHAEL G. ADAMS, in his
official capacity as the Secretary of State
for Kentucky, *et al.*,

     *Defendants.*

Civil Action No. 3:24-cv-387-BJB

---

**DEFENDANT SECRETARY OF STATE MICHAEL G. ADAMS' MEMORANDUM
IN SUPPORT OF HIS MOTION TO DISMISS**

---

## INTRODUCTION AND SUMMARY

Plaintiff Kentuckians for the Commonwealth ("KFTC") brings a facial challenge and requests a permanent statewide injunction of a Kentucky election law that was enacted in bipartisan fashion and has been on the books for three (3) years. That law ensures the accuracy of Kentucky's voter rolls by removing the names of those who have taken action to register to vote in another state. This suit's timing suggests a last-ditch attempt to sow chaos into an election system that has been working quite well – indeed, that has been celebrated nationally. Recent caselaw from the Supreme Court of the United States and the Sixth Circuit make clear that KFTC does not have standing to invoke this Court's jurisdiction to challenge the statute. It should be dismissed for that reason alone. Fed. R. Civ. P. 12(b)(1). If the Court does reach the merits, there is no conflict between Kentucky and federal law – and thus no preemption – because both laws focus on accurate voter rolls driven by voter autonomy on choice of residence. The suit therefore also fails to state a claim under Fed. R. Civ. P. 12 (b)(6).[1]

## FACTS

Defendant Secretary of State Michael G. Adams ("Secretary Adams") is the chief election officer for the Commonwealth of Kentucky and sits as the Chair of the Kentucky State Board of Elections ("SBE"), also a Defendant.

KFTC describes itself as a "nonpartisan grassroots organization" and claims that its "mission is to challenge and change unfair political, economic and social systems by working for a new balance of power and a just society." Dkt. 1 at ¶ 5. It purports to use "its resources for grassroots power-building and increasing engagement in local, state, and federal democracy." *Id.*

---

[1] The Sixth Circuit applies the *Twombly* plausibility test to motions to dismiss for lack of standing as well as under Rule 12 (b)(6). *See Ass'n of Am. Physicians & Surgs. v United States FDA*, 13 F.4th 531, 543-544 (6th Cir. 2021); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

2

It states that "[o]ne of the key ways KFTC achieves this is through its statewide in-person voter registration program, which seeks to register low propensity voters such as people with low socioeconomic status, young people, people of color, the formerly incarcerated, and pretrial detainees."[2] *Id.*

KFTC "sues herein on its own behalf and on behalf of its members." *Id.* Yet KFTC's Complaint does not identify even one of its members who has been prevented from voting or wrongly purged from Kentucky's voter rolls – though it has had three (3) election cycles in which to find one.

It claims that the method of removing out of state voters in Ky. Rev. Stat. § 116.113(4) (2021)[3] violates the National Voter Registration Act of 1993, 52 U.S.C. § 20501-20511 (the "NVRA").[4] Dkt. 1 ¶¶ 1, 4, 8.

**<u>The NVRA</u>**

The federal National Voter Registration Act of 1993, 52 U.S.C. §§ 20501-20511, requires states "to conduct a general program" that makes a "reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." The point is to ensure the accuracy of

---

[2] Secretary Adams agrees that every eligible American should have the opportunity to register to vote and be heard in our democratic process. That's why he serves as co-chair of National Voter Registration Day. [Exhibit 1].

[3] This would have been the correct citation at the time KFTC filed its Complaint on June 28, 2024. A new subsection (3) was added to KRS 116.113 to outline a procedure for removing non-citizens from the voter registration records; that became effective on July 15, 2024, now making KRS 116.113 look different in terms of the numbering of subsections on its face. The subsection at issue is now numbered KRS 116.113(5).

[4] A private party suing under the NVRA must first send a notice to the state. KFTC's demand letter to Defendants, dated August 31, 2023, included an Open Records Request. The Complaint inaccurately states that "Defendants provided no response to Plaintiff's request." Dkt 1 at ¶ 37. In fact, the Complaint states that "[t]he Secretary of State's General Counsel and Assistant Secretary of State Jennifer Scutchfield, acknowledged receipt of the notice letter on September 7, 2023." *Id.* at ¶ 35. Plaintiff attached its demand letter and document request. *Id.* at Exhibit A. Plaintiff's letter to the SBE incorrectly asserts that it attaches "the Secretary of State's denial of the same open records request." *Id.* at Exhibit C. It does not. What that missing attachment reveals is that on September 7, 2023, the office of Secretary Adams responded that his office did not have any responsive documents. *See* [Exhibit 2].

the state voter rolls by removing the names of people who have died, been convicted of a felony, been adjudged as incompetent or relocated to another state. 52 U.S.C. § 20507(a)(4).

Section 8 of the NVRA specifies two circumstances under which a voter may be removed from the rolls because the voter has moved to another jurisdiction. 52 U.S.C. § 20507(d).

First, a state can remove a person from the voter registration list based upon the registrant's written confirmation of a change in address outside the jurisdiction. 52 U.S.C. § 20507 (d)(1)(A).[5]

Second, the overwhelming majority of Kentucky voters who are removed from the rolls go through the following process (the "Postcard Process," NRVA § 8(d)(2)). If the State Board of Elections gets information from the Post Office that a voter has moved to an address that differs from that on the voter rolls, it sends the identified voter a returnable, forwardable, correctable postage-paid card. The date of the card is noted on the voter registration record. If the voter continues to vote in Kentucky or updates his or her Kentucky registration, he or she is not removed from the rolls. If the voter does not take any action within the next two federal elections after the postcard was sent, the voter registration is removed from Kentucky's rolls, per state *and* federal law. The Postcard Process is the means by which most ineligible voters, other than the deceased, are purged. Kentucky and federal law err on the side of protecting voters from erroneous purgation by keeping the voter on the rolls for four years – two federal election cycles – after a postcard to them has been returned as undeliverable.

**The Consent Decree**

Kentucky's track record with keeping its voter rolls free of dead people, felons and

---

[5] The NRVA provides that "(1) A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant – A) confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered." 52 U.S.C. § 20507(d)(1)(A) (emphasis added). This is the provision that KFTC contends conflicts with Kentucky law.

nonresidents was abysmal prior to Secretary Adams assuming office. The watchdog organization Judicial Watch compared the voter registrations in Kentucky and the number of citizens old enough to vote; it found that 48 Kentucky counties had registration rates exceeding 100 percent of their age-eligible citizens – there were more people registered to vote than people eligible to vote. In fact, it was so bad that Secretary Adams' predecessor was sued for failing to comply with the NVRA's requirement that states take "reasonable" steps to keep the voter registration rolls current. The Department of Justice joined in the lawsuit. That suit resulted in a Consent Decree that remains in force. *Jud. Watch, Inc. v. Adams*, 485 F. Supp. 3d 831 (E.D. Ky. 2020). Per the Consent Decree, Kentucky uses the Electronic Registration Information Center ("ERIC") to exchange information with other states to identify voters who have moved out of state and registered elsewhere.[6] Kentucky continues to use that same system, approved in the Consent Decree.[7]

### KRS 116.113

In addition to mailing postcards to voters, Kentucky also fulfills its NVRA duty to take "reasonable" efforts to keep its voter rolls clean through KRS 116.113. This election reform statute was passed on a bipartisan basis (nearly unanimously) and signed by Kentucky's Democratic governor in 2021. It specifies that when Kentucky receives information from another state that one of its voters has registered in the other state, then that voter's name must be purged from Kentucky's rolls within five days.[8]

Plaintiffs complain that 127,000 people were removed from Kentucky's rolls in 2023. Dkt.

---

[6] *See generally* Democracy's Bureaucracy: The Complicated Case of Voter Registration Lists, 103 B.U. L. Rev. 2123 (2023). Because ERIC requires the voter to take the initiative of registering in the new jurisdiction, it is much more accurate than the older system, Crosscheck, which simply compared voter registration lists across state lines. Crosscheck is not used in Kentucky and is not at issue here.

[7] SBE also receives information from individual states and returned mail to identify those who receive the NVRA § 8(d)(2) mailings.

[8] The voter has the opportunity to protest if the purge was in error. KRS 116.113(6)

1 at ¶ 49. The overwhelming majority of these names were removed by the Postcard Process. Only a fraction of those removals (approximately 20,000) came from voters moving out of state and registering in a new state that then informs Kentucky. These removals stem from the voter registering – by signature – outside of Kentucky. The new state of residence asks where the voter was previously registered so that it can then notify the state from which the voter moved. Pursuant to KRS 116.113, Kentucky then removes the former resident from its rolls to prevent that person from voting in two places simultaneously, which is against the law.

## ARGUMENT

## I.  THIS COURT DOES NOT HAVE JURISDICTION BECAUSE KFTC DOES NOT HAVE STANDING EITHER AS AN ORGANIZATION OR ON BEHALF OF ITS MEMBERS.

Article III of the Constitution limits the subject-matter jurisdiction of federal courts. U.S. Const. Art. III § 2. The requirement of an actual "Case" or "Controversy" is fundamental to the separation of powers. The plaintiff's standing therefore must be addressed as a threshold matter. *Nikolao v. Lyon*, 875 F.3d 310, 315 (6th Cir. 2017) (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94-95 (1998)). Standing requires a plaintiff to prove that "(1) [it has] suffered an injury-in-fact that was (2) caused by defendants' conduct and that (3) this court can likely redress the injury with a decision for the [p]laintiff[]." *Id*. at 315-16 (internal citation and quotation omitted). The Plaintiff bears the burden of establishing these elements, as it is the party attempting to invoke this Court's jurisdiction. *Shearson v. Holder*, 725 F.3d 588, 592 (6th Cir. 2013). "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc*., 581 U.S. 433, 439 (2017) (cleaned up). Injury-in-fact is the "first and foremost of standing's three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (internal citation and quotation omitted).

### A.  KFTC does not have standing because it has not suffered an injury-in-fact.

To satisfy the injury-in-fact requirement, KFTC must allege that it "[has] suffered an injury-in-fact, which is 'concrete, particularized, and actual or imminent.'" *Shearson*, 725 F.3d at 592 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). A "particularized" injury is one that the plaintiff has personally suffered in an individual way. *Spokeo*, 578 U.S. at 339 (internal citation and quotation omitted). "Particularization is necessary to establish injury-in-fact but it is not sufficient." *Id*. An injury must also be concrete. "To be 'concrete,' the "injury must be '*de facto*'; that is, it must actually exist." *Id.* (quoting Black's Law Dictionary 10th ed. 2014).

To demonstrate that the threat of future harm satisfies the injury-in-fact requirement of imminence, the facts must plausibly allege that there is a "substantial risk" that harm will occur. *Clapper*, 568 U.S. at 441 n.5. "Allegations o*f possible* future injury are not sufficient." *Id*. at 409 (emphasis in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Likewise, "a highly attenuated chain of possibilities [ ] does not satisfy the requirement that threatened injury must be certainly impending." *Id*. at 410. KFTC has not met this burden.

That burden became much heavier following a major retrenchment on organizational standing by the Supreme Court of the United States last Term. *See FDA v. All. For Hippocratic Med.*, 602 U.S. 267 (2024). In *Alliance For Hippocratic Medicine*, pro-life doctors and medical associations asserted that they had organizational standing to challenge FDA regulation of mifepristone, the abortifacient drug. *See generally id*. Much like KFTC's dispute with Defendants here, the doctors and medical associations claimed that the FDA had "impaired *their* ability to provide services and achieve *their* organizational missions." *Id.* at 394. To respond to the FDA's regulatory actions, the medical associations claimed they had to "spend considerable resources to the detriment of other spending priorities." *Id.* at 395 (internal quotation omitted). A

unanimous Supreme Court rejected the argument: "an organization that has not suffered a concrete injury caused by defendant's action *cannot spend its way into standing* simply by expending money to gather information and advocate against the defendant's action. An organization cannot manufacture its own standing in that way." *Id.* at 394 (emphasis added).

The medical associations had relied on *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), where a housing counseling organization was held to have standing because it had been injured by the defendant giving it false information, which caused the organization to divert its resources in reliance on the false information.[9] Standing was proper in *Havens Realty* by analogy "to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* However, the Supreme Court has now limited *Havens Realty* to its facts: "*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context. So too here." *All. For Hippocratic Med.* 602 U.S. at 395. KFTC has not alleged that Defendants – or anyone, for that matter – have given it false information that it has relied on.

The constrained viability of *Havens Realty* also calls into question the soundness of the Seventh Circuit case that KFTC relies on in its Complaint. *See* Dkt. 1 at ¶ 30. Those opinions addressed Indiana state voter purgation statutes that were enjoined as violative of the NVRA. But the reasoning of *Alliance for Hippocratic Medicine* clarifies that the Seventh Circuit would not have had jurisdiction to reach the merits of the purgation statutes, because the voter advocacy groups' theory of standing relied on *Havens Realty* for "diversion of resources." The Indiana voter advocacy groups cannot spend their way into standing any more than can KFTC or the medical associations in *Alliance For Hippocratic Medicine*.

---

[9] *Havens* sought damages, not an injunction, and as the Sixth Circuit has noted, "plaintiffs who have standing to bring a damages claim do not necessarily have standing to bring a claim for injunctive relief." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 n.1 (6th Cir. 2014). Here, KFTC has not even pled actual damages.

An organization may assert standing on its own behalf only if it can demonstrate the defendant's conduct caused a concrete and demonstrable injury to the organization's activities. KFTC as an entity cannot register to vote. And there is no indication that any of KFTC's members have been or will be affected by KRS 116.113. Instead, KRS 116.113 purportedly injures KFTC by "hampering [its] abstract social interest in maximizing voter turnout." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 461 (6th Cir. 2014). KFTC "cannot manufacture standing by choosing to make expenditures based on" an alleged harm that does not itself qualify as an injury-in-fact. *Clapper*, 568 U.S. at 402.

KFTC, like *Alliance For Hippocratic Medicine,* claims that diversion of resources constitutes its harm. It states that implementation of KRS 116.113 "directly frustrates KFTC's civic mission and causes it to expend its limited financial resources and staff time." Dkt. 1 at ¶ 8. It speculates that the Kentucky statute will "improperly purge eligible voters that KFTC has already registered, force KFTC to reregister improperly purged voters, will require KFTC to unnecessarily expand its voter registration education, and will compel its members to monitor their voter registration status to ensure that they are not disenfranchised because of being purged from the voter rolls without notice." *Id.* It alleges that it is "hiring at least 15 people across the state, who will support its voter registration." Dkt. 1 at ¶ 6. It says that it "provides important education and voter registration training, including webinars and field training, to its staff and allies committed to in person voter registration work." *Id.*

KFTC has not plausibly alleged that it is "diverting" any resources at all. Dkt. 1 at ¶¶ 8, 47. The Complaint at its core alleges that Plaintiff is spending voter education and registration resources on voter education and registration. *See* Dkt. 1 at ¶¶ 7, 8. Accordingly, it has not incurred an injury-in-fact, in the past three years or going forward. Recent case law underscores the

weakness of KFTC's standing.

The Sixth Circuit recently applied *Alliance For Hippocratic Medicine* in the context of the NVRA. In granting an appellant's stay of the district court's grant of a preliminary injunction, the Sixth Circuit held that the Tennessee Conference of the NAACP was not likely to succeed on the merits of demonstrating standing to challenge a Tennessee election law on voter registration of felons as conflicting with the NVRA. *See Tenn. Conf. of the NAACP v. Lee*, 105 F.4th 888 (6th Cir. 2024) (per curiam).

At the outset, the Sixth Circuit noted that when – as here – "a plaintiff challenges a government regulation 'of someone else' the plaintiff will have a 'substantially more difficult time' establishing standing" *Id.* at 902 (cleaned up). "In that scenario, it is often 'speculative' whether the unregulated plaintiff's asserted injury flows out of the government's regulation of the third party – rather than from some other factor.'" *Id.* (quoting *All. For Hippocratic Med.*). KFTC faces the same difficulty as the Tennessee NAACP and the medical associations with respect to the government conduct challenged: the Kentucky statute neither requires nor forbids any action by KFTC.

Like KFTC, the Tennessee NAACP had invoked the "diversion-of-resources" theory of standing derived directly from *Havens Realty*. The Sixth Circuit noted that the Supreme Court has limited the *Havens Realty* to a "narrow domain," and that its "unusual" facts did not support a categorical rule allowing standing whenever 'an organization diverts its resources in response to a defendant's actions.'" *Tenn. Conf. of the NAACP,* 105 F.4th at 905 (citing *All. For Hippocratic Med.).* KFTC alleges it will have to spend money to train staff and warn voters to monitor their registration status. *See* Dkt. 1 at ¶¶ 8, 47.  That is much the same as the medical associations and the Tennessee NAACP: "public education" to warn patients (or voters) about a perceived risk of a

government policy to which the plaintiff organization objects. Like the medical associations and the Tennessee NAACP, KFTC has only alleged that it has "made a decision to spend money to minimize the alleged harms" from the government regulation it opposes. *Tenn. Conf. of the NAACP* 105 F. 4th at 903; *see also* Dkt. 1 at ¶ 8.

As set forth below, KRS 116.113 does not conflict with the NVRA. But even if it did, "'Article III standing requires a concrete injury even in the context of a statutory violation.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 414 (2021) (quoting *Spokeo*, 578 U.S. at 341). The plaintiff still must allege that it suffered a concrete injury caused by defendants' violation of the federal law. *Id.* at 426-27.

Nor does KFTC's concern that its members face a risk of erroneous purgation constitute an injury-in-fact. In *TransUnion,* consumers whose credit ratings inaccurately flagged them as a potential match with a terrorist watch list complained that even if the credit agency had not sent the false information to anyone, the risk that it might was an injury-in-fact. The Supreme Court rejected the argument: "we cannot simply presume a material risk of concrete harm." *TransUnion LLC,* 594 U.S. at 438 (cleaned up). "[N]ot all inaccuracies cause harm or present any material risk of harm." Nor does the "mere violation of a statute or procedure without more." *Spokeo*, 578 U.S. at 342; *see also Hagy v. Demers & Adams*, 882 F.3d 616, 621 (6th Cir. 2018). KFTC alleges that it will have to expend resources to monitor whether its members get erroneously stricken from the voter rolls. *See* Dkt. 1 at ¶ 8. The risk is speculative. KFTC's fear of individual mistakes by election officials "generally speaking, does not create a cognizable imminent risk of harm." *Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 981 (6th Cir. 2020) (per curiam).

### *KFTC cannot assert standing on behalf of its members.*

In addition to assertion of standing as an organization, KFTC purports to sue "on behalf of

its members." Dkt. 1 at ¶. 5. The medical associations likewise attempted to sue "in a representative capacity to vindicate their patients' injuries and potential future injuries." *All. for Hippocratic Med.* at 602 U.S. at 392 n.5. The Supreme Court rejected this grasp at third-party standing: "[E]ven when we have allowed litigants to assert the interests of others, the litigants themselves must have suffered an injury-in-fact, thus giving them a sufficiently concrete interest in the outcome of the dispute." *Id.* (cleaned up). KFTC cannot shoehorn itself into Article III standing by showing that its members have or will suffer injuries that remain speculative and hypothetical.[10] Again, **KFTC's Complaint has failed to identify a single member who has been injured over the last three years**. It has not identified even one member who has been forced to "reregister" or who was denied the right to vote due to erroneous purgation. Dkt. 1 at ¶ 47. Failure to find an injury in the past underscores how unlikely it is that any member will be injured in the future. *Tenn. Conf. of the NAACP,* 105 F.4th at 904 (internal citations and quotations omitted). KFTC "must do more than identify a likelihood that the defendant's conduct will harm an unknown member in light of the organization's extensive size or membership base." *Ass'n of Am. Physicians and Surgs. v. United States FDA,* 13 F.4th 531, 543 (6th Cir. 2021). KFTC's belief that the Kentucky statute has "harmed thousands does not prove its standing unless it adequately shows that it is 'among the injured.'" *Id*. at 537 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1982)).

> **B. Any injury to KFTC is neither traceable to the Secretary of State nor redressable by him.**

Secretary Adams cannot redress an injury that has not occurred, and the likelihood of such injury to occur in the future is entirely speculative.[11] Even if KFTC had alleged a past injury (it

---

[10] Justice Thomas wrote separately to express "serious doubts that an association can have standing to vicariously assert a member's injury." *All. for Hippocratic Med.* *44 (Thomas, J., concurring). He urged the Court to "address whether associational standing can be squared with Article III's requirement that courts respect the bounds of their judicial power." *Id.* at 52.

[11] No more voters will be removed from the rolls before the November election. State and federal law impose a 90

has not), any prospective injury would be the result of voters choosing to register to vote in a state other than Kentucky, despite having previously registered here. Defendants cannot prevent voters from moving out of state. Whether or not KFTC's members will relocate out of state is far from "certainly impending." *Tenn. Conf. of the NAACP,* 105 F.4th at 904 (cleaned up). Moreover, the voters might not even be members of KFTC. This creates a real problem of redressability. How can any relief in this case satisfy the element of redressability if KFTC has not itself been injured and the hypothetical voters may not even be parties? *See Ass'n of Am. Physicians and Surgs.*, 13 F.4th at 539. Absent imminent impending harm, there is nothing to support an injunction. As the Sixth Circuit has held, "organizations cannot establish their standing by diverting resources to eliminate a risk of harm to third parties that is not imminent." *Tenn. Conf. of the NAACP*, 105 F. 4th at 905.

Defendants cannot prevent voters from registering to vote in the state of their new home. Simply put, the actions of the voter are an intervening event over which Secretary Adams has no control whatsoever. The supposed injury is not traceable to Secretary Adams. Nor can the asserted injury be redressed by the relief KFTC seeks. *See Davis v. Colerain Twp.*, 51 F. 4th 164, 171 (6th Circ. 2022).

## II.    KRS 116.113 DOES NOT VIOLATE THE NVRA BECAUSE NO VOTER IS REMOVED SIMPLY BECAUSE OF HAVING MOVED OUT OF STATE.

It is illegal to vote in more than one state for the same election: in Kentucky, it's a Class D felony. KRS § 119.165. Once the voter registers to vote in another state – which requires the voter's signature – that state notifies Kentucky. The new state has the information because it asks the voter where he or she was previously registered as part of the registration process. Defendants at that point have a statutory duty to remove the former Kentucky voter from Kentucky rolls. KFTC

---

day "quiet period" prior to the election. NVRA § (c)(2)(A); KRS 116.112(6).

would have Kentucky's election officials ignore credible evidence from their counterparts in other states that former Kentuckians are now registered to vote in another state. That would violate not just a Kentucky state statute, and the NVRA, but also the Consent Decree.[12] "There is no authority in the NVRA for a court to force a state to continue to maintain the registration of an individual when it has received documentary proof – a written certification signed by a voter submitted in a different state – that the individual is claiming legal residence in that other state and is therefore no longer eligible to vote in his or her former state." *See* https://www.heritage.org/election-integrity/report/misreading-the-national-voter-registration-act-preventing-states-using/#_ftnref20, [Exhibit 3].

It's important to understand that Kentucky only receives notice from another state if its former resident *has registered to vote in a state outside Kentucky.* It is a voter-driven decision, triggered by the voter signing a registration form elsewhere. That satisfies the NVRA requirement of a written voter confirmation. The plain text of the NVRA allows "Removal of names from voting rolls" when "the registrant – confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered." KFTC mischaracterizes the text of the NVRA by inserting a requirement of "direct contact" between the voter and Kentucky's election officials. *See* Dkt. 1 at ¶¶ 27, 28, 32. The NVRA says no such thing.

The NVRA text does not limit how or to whom "the registrant – confirms in writing." The text does not require that "the registrant – confirm[] in writing" to his or her former state rather than the new state. To read the NVRA as requiring the voter to send another signature to Kentucky – having already signed elsewhere – engrafts a textual requirement onto the NVRA that Congress did not enact. The NVRA requirement of a "request of the registrant" would include "actions that

---

[12] *See* 3:17-cv-00094-GFVT Dkt. 39 at 10.

result in the registrant being registered at a new address, *such as registering in another jurisdiction* or providing a change-of-address notice through the driver's license process that updates the voter registration." National Voter Registration Act of 1993, Report 103-9 U.S. House of Representatives 103rd Cong. 1st Sess. (Feb. 2, 1993) (emphasis added), attached as [Exhibit 4].[13]

To evade that textual problem, Plaintiff mischaracterizes the purgation process in Kentucky. There is a big difference between striking a voter off the roll solely because he or she moved, and removing the voter's name from Kentucky's roll because he or she took the additional affirmative step of informing another state in writing that he or she will now vote there.

The Supreme Court made a similar distinction in its last NVRA case, *Husted v. A, Philip Randolph Institute*, 584 U.S. 756, 780 (2018). Kentucky does not remove voters *solely* for changing residence, any more than the Ohio law challenged in *Husted* removed registration "*solely by reason of the failure to vote.*" *Husted*, 564 U.S. at 768 (emphasis in original). The former Kentuckians did more than just move: they signed up in another state to vote there, and in that process told their new state where they were previously registered. It is this later step – registration in another state – that triggers their removal from the Kentucky voter rolls after the new state informs Kentucky. Once that happens, Kentucky may not only remove the name of the non-residents: under federal and state law it must. As the Supreme Court noted, "requiring additional evidence not only second guesses the congressional judgement in [NVRA] subsection (d)'s removal process, but also second guesses the judgement of the [state] legislature as expressed in its statute." *Id*. at 774. Kentucky treats the act of state registration as "evidence that a registrant has moved." *See id*. Neither subsection (d) nor any other provision of the NVRA demands that a state have "some particular quantum of evidence of a change of residence." Congress left it to

---

[13] This legislative history is probative of the contemporaneous, ordinary public meaning of the phrase "confirms in writing" in the NVRA.

Kentucky to determine what evidence is probative as the Kentucky legislature has done in KRS 116.113.

"Congress did not establish a specific program for states to follow for removing ineligible voters and the Sixth Circuit has not addressed what a 'reasonable effort' entails." *Pub. Int. Legal Found. v. Benson*, 2024 U.S. Dist Lexis 47840, *31 (W.D. Mich. Mar 1, 2024). The Kentucky General Assembly has chosen to fulfill its "reasonable effort" obligations for the NVRA through KRS § 116.113. There is no conflict here, just Kentucky filling in the gaps of the federal statute as federalism allows. "Any contrary holding would raise serious questions about the constitutionality of Section 8 of the NVRA because Section 2 of Article I of the Constitution gives states complete authority to determine the qualifications (i.e., the eligibility) of individuals to vote for Members of Congress." *See* Heritage Foundation Report [Exhibit 3].

As Justice Thomas has noted, Congress does not have "the authority to displace state voter qualifications or dictate what evidence a State may consider in deciding whether those qualifications have been met." *Husted v. A. Philip Randolph Inst.*, 584 U.S. at 780 (Thomas, J., concurring). This Court should not construe the NVRA as encroaching upon Kentucky's authority to keep its voter rolls accurate by respecting a voter's choice to vote in a new jurisdiction after moving.

## CONCLUSION

"No concrete harm, no standing." *TransUnion LLC*, 594 U.S. at 417. KFTC has failed to allege a cognizable injury-in-fact, let alone one that is traceable to and redressable by the Secretary of State. There is no case or controversy here, no jurisdiction. Plaintiff's Complaint also fails to state a claim. It therefore should be dismissed with prejudice, and its request for a permanent, statewide injunction and attorneys' fees denied.

16

Respectfully Submitted,

*/s/ R. Kent Westberry*
R. Kent Westberry
Bridget M. Bush
W. Wood Brown
kwestberry@landrumshouse.com
bbush@landrumshouse.com
wbrown@landrumshouse.com
LANDRUM & SHOUSE LLP
220 W. Main Street
Suite 1900
Louisville, KY 40202
(502) 589-7616


/s/ Jenni Scutchfield
jscutchfield@ky.gov
Assistant Secretary of State
General Counsel
700 Capital Avenue, Suite 152
Frankfort, KY 40601
*Counsel for Michael G. Adams, in his official
capacity as the Secretary of State of
Kentucky*

## CERTIFICATE OF SERVICE

It is hereby certified by undersigned counsel that the foregoing was filed on this 30th day of August, 2024 through the federal Case Management Electronic Case Filing (CM/ECF) system, which will generate a notice of electronic filing (NEF) to all users who have registered in this action:

Taylor Austin Brown
General Counsel
State Board of Elections
140 Walnut Street
Frankfort, Kentucky 40601
TaylorA.Brown@ky.gov

Carmine Iaccarino
Sturgill Turner
333 West Vine Street, Suite 1500
Lexington, KY 40507-1681
carmine@strgillturner.com

Ben Carter
Kentucky Equal Justice Center
201 West Short Street, Suite 310
Lexington, KY 40507
ben@kyequaljustice.org

Michelle Kanter Cohen
Beauregard William Patterson
Fair Elections Center
1825 K Street NW, Suite 701
Washington, DC 20006
mkantercohen@fairelectionscenter.org
bpatterson@fairelectionscenter.org

*/s/ R. Kent Westberry*