**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION**

| | |
|---|---|
| KENTUCKIANS FOR THE COMMONWEALTH, *Plaintiff*,<br><br>v.<br><br>MICHAEL G. ADAMS, in his official capacity as the Secretary of State for Kentucky, *et al*., *Defendants*. | Case No. 3:24-cv-387-BJB<br><br>**Oral Argument Requested** |

## PLAINTIFF'S COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Plaintiff Kentuckians for the Commonwealth ("Plaintiff" or "KFTC") respectfully submits the following combined response to Defendants' Rule 12(b)(1) and 12(b)(6) motions. Defendants argue that this Court lacks jurisdiction over Plaintiff's claim and that Plaintiff has failed to state a claim. For the reasons discussed below, Defendants' motions should be denied.

### STATEMENT OF THE CASE

The National Voter Registration Act of 1993 ("NVRA") establishes essential procedures intended to uphold the integrity of the electoral process and enhance voter registration among eligible citizens. 52 U.S.C. §§ 20501–20511. However, KRS § 116.113(5) ("the purge provision") fails to adhere to the NVRA's requirements. Consequently, the removal program Defendants have implemented under the statute has eroded the accuracy of Kentucky's voter rolls, has failed to protect eligible voters from wrongful removal, and has relied on unconfirmed and ultimately false information to wrongfully as well as unlawfully disenfranchise eligible Kentucky voters.

Section 8 of the NVRA establishes specific safeguards to prevent the improper removal of registered voters from the rolls based on a change of residence. The NVRA dictates that removal can only occur if a registrant confirms their change of address in writing or fails to respond to a notice[1] mailing and does not vote in two subsequent federal general elections. 52 U.S.C. §§ 20507(d)(1)(A)–(B). However, KRS § 116.113(5) flouts these guardrails by requiring that voters be summarily removed without notice, the opportunity to respond, or the waiting period required by the NVRA for such removals. The purge provision accelerates the cancellation process to just five days and lacks any of the NVRA's guardrails that ensure an accurate match of identity before removal. ECF No. 35, ¶¶ 22–35.

The purge provision is deficient because it fails to require written confirmation that the registrant's address has changed before initiating the five-day removal process. This failure creates a real risk that eligible Kentucky voters may be mismatched by an out-of-state official, erroneously identified as having registered in another state, and then wrongfully purged. Further, the purge provision fails to mandate sufficient notification to voters about their removal, or the requisite waiting period, making it unlikely that wrongfully removed voters will learn of their change in status before attempting to vote. As a result, eligible voters are denied at the polls and disenfranchised because of Defendants' reliance on unconfirmed and ultimately erroneous information. Unlike the NVRA, which is designed to expand access to voting while allowing for reasonable list maintenance, KRS § 116.113(5) hampers voter participation.

As a nonprofit service provider with core organizational activities including helping eligible people register to vote, educating eligible voters, and mobilizing eligible voters to vote

---

[1] The notice must include a prepaid return card allowing registrants to affirm their current address, along with specific information on how to stay registered.52 U.S.C. §§ 20507(d)(2)(A)–(B).

through its Get Out The Vote ("GOTV") program, KFTC has experienced significant interference to its core activities as a direct result of Defendants' unlawful voter purges. KFTC has discovered that dozens to hundreds of the individuals that it served were subsequently subject to wrongful removal through Defendants' implementation of KRS § 116.113(5). Accordingly, the resources that KFTC invested in these individuals has been wasted because of Defendants' illegal actions. In addition to the harm caused by Defendants' interference with KFTC's core activities, KFTC faces other harms as well, such as increased demands to educate voters on confirming their registration status and the process for contesting erroneous removals. And as Defendants continue to engage in unnoticed purges, KFTC faces reputational harm as eligible voters who registered through KFTC blame the organization for their wrongful disenfranchisement.

All these harms support KFTC's request for facial or, in the alternative, as-applied declaratory and injunctive relief sufficient to stop Defendants' further interference with the organization's core activities. Therefore, the Court should deny Defendants' motions to dismiss.

## LEGAL STANDARD

In considering a Rule 12(b)(1) motion, the plaintiff "need[] only to plausibly allege standing's elements at the pleading stage." *Davis v. Colerain Twp., Ohio*, 51 F.4th 164, 171 (6th Cir. 2022). Plaintiff's general allegations are presumed to "embrace those specific facts that are necessary to support the claim." *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 710 (6th Cir. 2015) (citation omitted); *see also McKay v. Federspiel*, 823 F.3d 862, 868 (6th Cir. 2016) (distinguishing summary judgment standard from allegations sufficient to survive standing challenge at motion to dismiss stage). "When considering whether pleadings make out a justiciable case for want of standing, [the Court's] analysis must be confined to the four corners of the complaint." *Parsons*, 801 F.3d at 706. Although it is the plaintiff's burden to establish standing, *Thomas v. TOMS King*

*(Ohio)*, *LLC,* 997 F.3d 629, 634 (6th Cir. 2021), the Federal Rules do not require the plaintiff to provide a verified complaint or an affidavit in support of standing. Fed. R. Civ. P. 11(a) ("Unless a rule or statute specifically states otherwise, a pleading need not be verified or accompanied by an affidavit."); *see Farzana K. v. Indiana Dep't of Educ.*, 473 F.3d 703, 705 (7th Cir. 2007) ("This means federal rule or federal statute, because state requirements for pleading do not apply in federal litigation. Rules established under the Rules Enabling Act supersede state norms.").

In considering a Rule 12(b)(6) motion, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015) (citation omitted). The Court's "review is typically limited to the complaint's allegations." *Berry v. U.S. Dep't of Lab.*, 832 F.3d 627, 637–38 (6th Cir. 2016). At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the Court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Thomas*, 997 F.3d at 634 (citation omitted). A motion to dismiss should not be granted unless "it appears *beyond doubt* that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012) (citation omitted) (emphasis added).

## ARGUMENT

KFTC brought this lawsuit to stop Defendants' ongoing interference with its core organizational activities. In enforcing KRS § 116.113(5), Defendants have engaged in an illegal removal program that both violates the NVRA and has wrongfully removed eligible voters resulting in their subsequent disenfranchisement. Defendants' actions have specifically harmed KFTC, because their broad purges, based on unconfirmed information, have caused dozens to

hundreds of voters in whom KFTC invested resources in registering, educating, and mobilizing to be wrongfully purged from the rolls. Consequently, all the time and resources that KFTC poured into helping and mobilizing these voters was wasted because of Defendants' illegal activity.

Defendants' wrongful purges rely on unconfirmed information that ultimately proves false. Defendants deny any duty under the NVRA to review a voter's written confirmation of a change in residence before removing a voter under KRS § 116.113(5). However, while an out-of-state official, relying on a signed voter registration form, may suspect that a Kentucky registrant has registered elsewhere, only a Kentucky official can access Kentucky's voter registration database to verify the match. To fulfill the NVRA's requirements, a Kentucky official must review an alleged registrant's form before removal to ensure that the person who is flagged for removal is in fact the same person actually being removed.[2] However, Defendants have implemented a process by which removal is triggered even in the face of unreliable information, incomplete information, or even incorrect information.

Dozens of individuals that KFTC registered or mobilized have been removed from the rolls based on unconfirmed and ultimately false information provided by out-of-state officials. The resources that KFTC invested in helping these registrants and prospective voters has been wasted as a direct result of the purge provision and Defendants' implementation of it.

I.    **KFTC has standing to bring this claim.**

    a.    **KFTC, like the Plaintiff in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), is a nonprofit service provider.**

Defendants' reading of *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S.

---

[2] The voter's signature, birthdate, full name with suffixes, date of registration in a different state, and last known address are all data points on a registration form that would reduce the likelihood of mismatches and wrongful removals.

367 (2024) ("*AHM*") misses the mark on how the standards for organizational standing were clarified by the Supreme Court and have been implemented by the Sixth Circuit. Without a doubt, organizational plaintiffs may still establish standing in their own right. *Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC*, 124 F.4th 990, 993 (6th Cir. 2025) (ordering remand for additional factfinding and holding that informational injury which interferes with plaintiff's core business activities can be sufficient to establish organizational standing following *Alliance of Hippocratic Medicine*). Critically, to establish standing, an organization must show that the challenged conduct interfered with the plaintiff's preexisting core activities. *Id.*

As background, in *AHM*, multiple medical associations sued the Food and Drug Administration ("FDA") for loosening regulatory requirements on the drug mifepristone. The medical associations asserted standing solely "based on their incurring costs to oppose [the] FDA's actions." 602 U.S. at 394. The Court rejected this argument, because "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.*

While "[i]t is not enough to broadly gesture toward 'a drain on an organization's resources,'" in this Circuit, standing is established where the court "find[s] that the [plaintiff] organization has alleged and shown that the conduct challenged in the suit interfered with the organization's 'core business activities.'" *Fair Hous. Ctr.*, 124 F.4th at 992–93 (citations omitted); *Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 445 (6th Cir. 2024), *cert. denied*, No. 24-676, 2025 WL 581648 (U.S. Feb. 24, 2025) (citations and quotations omitted) (An organizational plaintiff "may sue on its own behalf. . . when the organization's ability to further its goals has been 'perceptively impaired.'"). In *Fair Housing Center*, the Sixth Circuit emphasized a critical difference between the plaintiffs in *Havens* and the plaintiffs in *AHM*. *Id.* at 992. Specifically,

unlike in *AHM*, "the *Havens* plaintiff, HOME, 'not only was an issue-advocacy organization, but also operated a housing counseling service.'" *Id.* (citation omitted). In *Havens*, because the defendant's actions interfered with the counseling and referral services that HOME, a nonprofit corporation, provided, that injury was sufficient to establish standing. *Id*. Since HOME administered a housing counseling service, the defendant "directly affected and interfered with HOME's core business activities" by providing erroneous information to its staff. *Id*.

Similarly, KFTC is not only an issue-advocacy organization. It also provides specific services to Kentuckians, and these are among KFTC's core organizational activities. ECF No. 35, ¶¶ 43–46. These services include its 1) nonpartisan statewide voter registration program in which KFTC assists applicants by advocating that they register, and then by collecting and submitting their voter registration forms; 2) statewide nonpartisan GOTV program designed to increase the participation of all eligible Kentucky voters; and 3) nonpartisan voter education program that provides prospective voters with accurate information on registering to vote, when, where, and how to vote, and the legal rights and responsibilities of Kentucky voters. *Id.*, ¶¶ 43–54. Each of these programs provides free resources that reduce the barriers voters face and help voters become civically engaged. *Id.* The services that KFTC provides to prospective voters are its most public-facing work. *Id.*, ¶¶ 47, 71. This work is what KFTC is known for across the Commonwealth. *Id*. And, KFTC assigns significant staff and resources to maintain these programs. *Id.*, ¶¶ 43–55.

As in *Havens*, KFTC is a nonprofit service provider, just like HOME. And although KFTC provides services such as voter registration assistance without seeking financial or commercial gain, this core activity—fundamental to KFTC's mission—is severely impeded by Defendants' enforcement of KRS § 116.113(5). *Id.*, ¶¶ 43–69. Given these factual allegations, it is clear that KFTC has established organizational standing to bring its NVRA claim within *AHM*'s framework.

Defendants have directly interfered with KFTC's ability to conduct its voter engagement activities. By conducting illegal voter purges under KRS § 116.113(5), Defendants have removed dozens of eligible voters that KFTC has served through its voter engagement programs. *Id.*, ¶¶ 57–60. Wrongfully purging these individuals from the rolls directly interferes with KFTC's preexisting core organizational activities. *Id.*, ¶¶ 55, 66–68, 88. The goal of KFTC's voter registration program is to register eligible voters so they can vote in upcoming Kentucky elections. *Id.*, ¶¶ 43–50. However, wrongfully purging these individuals from the rolls without any notice disenfranchises these voters on Election Day and further requires that KFTC re-register these voters. *Id.*, ¶¶ 61, 65–68. As a result, all the resources that KFTC uses to register these voters in the first instance are wasted, and KFTC is required to invest additional resources simply to keep these eligible Kentucky voters on the rolls. *Id.*, ¶¶ 55, 66–68, 88. Accordingly, Defendants' enforcement of KRS § 116.113(5) essentially compels KFTC to waste resources re-registering certain voters, causing a direct financial injury to KFTC and its core voter registration work. *Id.*, ¶¶ 55, 61, 66–68, 88.

Similarly, Defendants' actions directly interfere with KFTC's GOTV programming. KFTC's GOTV program engages eligible, registered voters in low-propensity neighborhoods in order to increase civic participation among traditionally disenfranchised demographics. ECF No. 35, ¶¶ 45, 51–54. However, because KRS § 116.113(5) operates regardless of the NVRA's mandate that before removing a voter "on the ground that the registrant has changed residence," election officials must review a voter's written confirmation of their move—or alternatively, provide the mandatory notice and waiting period requirements for removal, 52 U.S.C. §§ 20507(d)(1)(A)–(B), Defendants have erroneously purged and unlawfully disenfranchised at least dozens of Kentucky voters. ECF No. 35, ¶¶ 22–35, 57–59. Wrongfully disenfranchising these voters directly thwarts KFTC's efforts to engage these voters. *Id.*, ¶¶ 43–75. All the staff time and resources that KFTC

has spent on these voters is wasted effort—a direct injury to KFTC—because these voters were unexpectedly and wrongfully denied their federal statutory right to remain registered to vote while still eligible due to Defendants' illegal purges. *Id.*, ¶¶ 55, 66–68, 88.

Moreover, KFTC has been forced to allocate additional resources to its voter education program so that it can continue to provide eligible Kentuckians with all the resources needed to vote in upcoming elections. *Id.*, ¶ 68. This specifically includes additional training for its staff, and additional education to staff, members, and registrants on how to monitor voter registration status or how to challenge a wrongful removal when identified. *Id.* As removed individuals are never provided notice of their removal under KRS § 116.113(5), KFTC's clients would be left unaware— if not for KFTC's educational resources—of their registration status and the legal procedures for challenging a wrongful removal. *Id.*, ¶¶ 28–30. Even so, by the time a voter discovers that they have been wrongfully removed, it is often too late to re-register in time to vote in an upcoming election. *Id.*, ¶¶ 28–30. The overall impact of the need for increased voter education creates additional demands on staff time which ultimately limit the overall reach KFTC can have with its current staffing. *Id.*, ¶¶ 68–69.

### b. KFTC has suffered an actual injury to its voter engagement program.

KFTC's alleged injuries are not speculative. KFTC has identified 111 individuals who it believes were served by its voter engagement program and were later removed under the purge provision. *Id.*, ¶¶ 57–59. KFTC has strong reason to believe that at least 12 of these individuals were wrongfully purged by Defendants and forced to re-register at the same address in order to vote in subsequent elections. *Id.*, ¶¶ 59–61. Further, based on its review of a list of over 10,000 Kentucky voters purged under KRS § 116.113(5), KFTC has strong reason to believe that there are dozens to hundreds of additional individuals who were served by its voter engagement program

9

and were later wrongfully purged. *Id.*, ¶¶ 57–63. According to Defendants' estimation, 20,000 individuals have been purged under the statute. ECF No. 17-1 at 6. As the number of individuals purged under the statute has nearly doubled since KFTC originally obtained a purge list of 10,073 individuals, the Court can reasonably infer that KFTC will discover in the second group of purged voters at least as many individuals as it found in the first.

Put in other terms, at least 1 in 10 (or 12 out of 111) of the individuals who were served by KFTC's voter engagement program and removed under the purge provision were wrongfully purged. This high error rate guarantees that KFTC's core business activities will face ongoing injury unless the Court intervenes. ECF No. 35, ¶ 88. Further, if the Court reasonably infers that the 1 in 10 error rate KFTC's clients have faced is statistically representative of Defendants' total error rate for all individuals removed under KRS § 116.113(5), approximately 2,000 individuals may have been subjected to wrongful removal under the purge provision. Contrary to Defendants' assertions, this rate of error is far from reasonable. ECF No. 37-1 at 11. Also, the scale of Defendants' error rate supports KFTC's as-applied allegations that Defendants are removing people based on a mere phone call or list of names submitted by out-of-state officials and not based on signed voter registration forms. ECF No. 35, ¶ 26 and n.4. Thus, KFTC's specific injuries are concrete and actual, not speculative. *All. for Hippocratic Med.*, 602 U.S. at 394.

As in *Havens*, KFTC has also suffered significant interference with its organizational activities. *Fair Hous. Ctr.*, 124 F.4th at 992. Rather than dispose of erroneous information, Defendants' have further disseminated the information, relying on it to purge eligible voters. This interferes with KFTC's core business activities. KFTC's First Amended Complaint alleges Defendants have acted on unconfirmed and ultimately erroneous information to purge dozens of individuals that KFTC directly served through its voter engagement programming. ECF No. 35,

¶¶ 57–62. Defendants' use of erroneous information is in direct opposition to KFTC's programs. *Id.*, ¶¶ 57–62, 66, 86. Where KFTC invested resources in registering these individuals, Defendants, adopting erroneous information, deregistered these individuals. *Id.*, ¶¶ 57–61, 66. Where KFTC invested resources enfranchising these individuals, Defendants, adopting erroneous information, disenfranchised these eligible voters, purging them without notice. *Id.*, ¶¶ 61–62, 66. Where KFTC has invested resources in educating these individuals about their eligibility to vote in Kentucky, Defendants have propagated erroneous information that these individuals are ineligible to vote in Kentucky. *Id.*, ¶¶ 54, 59–62, 66, 86. For the sake of expedience, Defendants have violated the NVRA and disenfranchised eligible Kentucky voters based on unconfirmed and erroneous information from out-of-state officials. *Id.*, ¶¶ 59–62, 86.

These harms could have been avoided had Defendants implemented an NVRA-compliant procedure whereby Kentucky officials review a voter's out-of-state registration form before removing that voter from the rolls thus ensuring that the voter is in fact the same person who is attesting to a change in residence by registering to vote in another state. *Id.*, ¶ 91. Instead of engaging in this action, which has a very low administrative burden, Defendants have illegally acted on the representations of out-of-state officials who neither have access to Kentucky's voter registration database nor have any legal duty to Kentuckians whatsoever. *Id.*, ¶¶ 59–62, 86. As a result, Defendants' reliance on unconfirmed and erroneous information has directly interfered with KFTC's core organizational activities and has made Kentucky's voter rolls less accurate.

### c. KFTC's claim for standing is not like that asserted in *AHM*.

The Alliance of Hippocratic Medicine's failed bid for standing in *AHM* is distinguishable from what KFTC alleges here. In *AHM*, the plaintiffs argued that the challenged practice, which they did not want to engage in themselves, "'forced' the[ir] associations to 'expend considerable

time, energy, and resources' drafting citizen petitions to FDA, as well as engaging in public advocacy and public education." 602 U.S. at 394. In arguing this, the plaintiffs established no causal nexus between the challenged rule and the alleged harm to preexisting core activities, as required under *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982). *Id.* at 369. By contrast, KFTC has both suffered and pled a particularized injury to its longstanding, core business activities. ECF No. 35 ¶¶ 43–75. Defendants' unlawful actions have directly harmed how effectively KFTC can engage in its core activities and have further wasted its scarce resources. *Id.* Not once in its First Amended Complaint or briefing has KFTC mentioned any resources it has spent opposing or challenging KRS § 116.113(5). KFTC's injuries are based solely on costs and burdens related to fulfilling its core business activities. *Id.* Therefore, this case is unlike *AHM*, where plaintiffs sought standing solely based on organizational costs incurred by the Alliance for Hippocratic Medicine's activism and opposition in response to an FDA rule.

Moreover, Defendants cite to *Tennessee Conference of the NAACP v. Lee*, 105 F.4th 888 (6th Cir. 2024), to challenge Plaintiff's standing here, but that case does not advance their cause either. ECF No. 38 at 6–7. In *Lee*, the Court entered judgment against the plaintiff, because during summary judgment, the plaintiff failed to back up its diversion-of-resources allegations with adequate proof. *Tennessee Conf. of NAACP*, 105 F.4th at 903, 907 (finding no standing where, at summary judgment, the plaintiff's only factual support for standing was conclusory allegations in a single affidavit). By contrast, here at the pleading stage KFTC needs "only to plausibly allege standing's elements" within the four corners of the complaint, *Davis*, 51 F.4th at 171, and all factual allegations are construed in its favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

*Republican National Committee v. Benson*, No. 1:24-CV-262, 2024 WL 4539309, at *1 (W.D. Mich. Oct. 22, 2024), cited by Defendants, is also inapposite to this case. The plaintiff there

was a political party. Political parties are, by nature, advocacy groups, and the plaintiff in that case did not rely on activities akin to service providers. *See* "*party*," Merriam-Webster.com, https://www.merriam-webster.com/dictionary/party#h1 (last visited Mar. 21, 2025) (defining "political party" as "a group of persons organized for the purpose of directing the policies of a government"). Further, the district court found that the "RNC allege[d] only the *potential* of a diversion of resources," which is "[u]nlike the within-mission resources diverted in *Havens*." *Benson*, 2024 WL 4539309 at *11. By contrast, KFTC is a nonpartisan, direct service provider. Its claim for standing is based on a loss of within-mission resources caused by Defendants' reliance on incorrect information rather than on an NVRA-compliant process. These injuries directly interfere with KFTC's core business activities like in *Havens*. By contrast, *Benson* did not address standing based on injuries to an organization's core business activities.

### d. Defendants have caused and will continue to cause KFTC's injuries, and these injuries can be remedied by declaratory and injunctive relief.

Further, Plaintiff also satisfies the causation element for standing. To have standing, a plaintiff's injury must be "fairly traceable" to the defendant's challenged conduct. *Bennett v. Spear*, 520 U.S. 154, 167 (1997). At the pleading stage, this burden is "relatively modest." *Id.* at 171. For suits against public officials, plaintiffs need only allege a "'meaningful nexus' between the defendant and the asserted injury." *Durham v. Martin*, 905 F.3d 432, 434 (6th Cir. 2018) (citations omitted). This nexus between a plaintiff's injuries and a defendant's unlawful acts or omissions need not be proximate and may be indirect. *Parsons*, 801 F.3d at 713. "[T]hat a defendant was one of multiple contributors to a plaintiff's injuries does not defeat causation." *Id.* at 714. Nor does the challenged conduct have to be the "very last step in the chain of causation." *Bennett*, 520 U.S. at 169. The touchstone for Article III traceability is "more than speculative but less than but-for" causation. *Parsons*, 801 F.3d at 714.

13

The "meaningful nexus" here is straightforward. Defendant Secretary Adams is designated as Kentucky's chief election official,[3] as required under the NVRA.[4] *See* 52 U.S.C. § 20509 ("Each State shall designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under this chapter."). And thus, Defendant Secretary Adams is responsible for ensuring Kentucky is NVRA-compliant. ECF No. 35, ¶ 6. Further, Kentucky law charges Defendants with administering KRS § 116.113(5). Under the statute, the State Board of Elections is expressly required to remove the voters at issue within five days. KRS § 116.113(5). And the Secretary of State, who by statute is the chair of the Board, and the other members of the State Board of Elections promulgate the administrative regulations necessary to enforce Kentucky's election laws, including KRS § 116.113(5). KRS § 117.015. Therefore, Defendants must enforce KRS § 116.113(5) while also ensuring NVRA compliance. Their acts and omissions in carrying out these duties are directly causing Plaintiff's ongoing injuries.

KFTC also satisfies the redressability element of standing. An injury is redressable if "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" by providing "substantial and meaningful relief." *Parsons*, 801 F.3d at 715 (citations omitted). Plaintiff's requested injunction barring Defendants from cancelling the registration of voters without following the required procedures set forth in 52 U.S.C. § 20507(d) would unquestionably cure KFTC's injuries. ECF No. 35 ¶¶ 90–91; Prayer for Relief (A)–(D).

---

[3] "Kentucky's Secretary of State is the Commonwealth's Chief Election Officer, Chief Business Official, and chief advocate for civic engagement." Ky. Sec'y of State, Off. of the Sec'y of State, https://www.sos.ky.gov/sos-office/Pages/default.aspx (last visited Apr. 2, 2025).

[4] "The State is responsible for ensuring compliance with the NVRA. The NVRA requires each State to designate a State officer or employee as the chief State election official to be responsible for coordinating State responsibilities under the Act." U.S. DOJ Civil Rights Division, *The National Voter Registration Act of 1993 (NVRA)*, https://www.justice.gov/crt/national-voter-registration-act-1993-nvra (last visited Apr. 2, 2025).

e. **In addition to Defendants' interference with KFTC's core activities, KFTC faces reputational harm.**

Finally, as an additional harm that KFTC is certain to face going forward, if Defendants' illegal purge program continues, KFTC will suffer severe reputational harm in the communities where it has worked and continues to work to secure trust so that it can fulfill its core mission. ECF No. 35 ¶ 70. KFTC's voter registration program is clearly branded on all materials used by its canvassers. *Id.*, ¶ 71. Its decades-long voter registration program is KFTC's most public-facing work, and it is known throughout the state for its staffed voter registration tables. *Id.* KFTC has a 38-year-old trusted brand throughout the Commonwealth—goodwill that has been earned over decades. *Id.* That trust will be damaged if the eligible voters registered through KFTC's program are unlawfully and erroneously removed from the voter rolls. *Id.*, ¶¶ 72–75.

Because these voters have placed their trust in KFTC's knowledge as to the proper and lawful way to register and stay registered to vote, such consequences will severely undermine voters' trust in KFTC as a reliable and knowledgeable organization. *Id.*, ¶ 73. Not knowing the details and effects of KRS § 116.113(5), community members whom KFTC has assisted will come to distrust KFTC, wrongly thinking that its canvassers did not provide correct information, guidance, and assistance, or even that their applications were submitted incorrectly. *Id.* These negative outcomes will also severely undermine voters' faith and trust in the electoral system, thereby significantly interfering with Plaintiff's core organizational activities. *Id.*, ¶ 74.

Some voters registered by KFTC will likely refuse to engage in the voter registration process again, once again impeding KFTC's core activity of community voter registration. *Id.* Others who are persuaded to re-register will nevertheless have less trust in KFTC and the election system going forward. *Id.* If Defendants continue to purge voters under KRS § 116.113(5) in violation of federal law, KFTC foresees ongoing reputational harm and a loss of trust that will

directly injure and undermine its ability to carry out its core activities. *Id.*, ¶ 75. If prospective voters refuse to participate in KFTC's voter engagement programming or in Kentucky's electoral system at large because of this chilling effect, then KFTC cannot effectively provide its voter engagement services to eligible voters, thus rendering its services defunct. *Id*.

*          *          *

Defendants' violations of the NVRA have significantly interfered with KFTC's preexisting core organizational activities. Absent an order from this Court, KFTC will continue to suffer these harms. Therefore, Plaintiff has organizational standing.

## II.    KFTC stated both facial and as-applied claims upon which relief can be granted.

KFTC has stated a valid claim that Defendants' enforcement of KRS § 116.113(5) violates the NVRA. Plaintiff has pled an NVRA claim in its First Amended Complaint as both a facial challenge and, in addition, as an as-applied challenge. Taken on its face, the plain meaning of the statute conflicts with the strictures of the NVRA. ECF No. 35, ¶¶ 22–35, 79. Additionally, as alleged, Defendants are enforcing the challenged purge law in such a way that it violates the NVRA with respect to a subset of or perhaps even all applications of KRS § 116.113(5). Accordingly, Plaintiff has sought not just facial invalidation, but in the alternative, an injunction restricting Defendants' implementation of KRS § 116.113(5) such that it is compliant with the NVRA. *Id.*, ¶¶ 68, 91, Prayer for Relief (A).

### a.    KFTC has stated a claim for a facial violation of the NVRA.

#### 1.    The NVRA requires that specific steps be taken before removing voters on the grounds that they have changed residence to outside Kentucky.

Under the NVRA, before a state removes a registered voter on the basis of a change in residence, the voter must "confirm[] *in writing* that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered," or the state must provide

that voter with adequate notice,[5] the opportunity to respond to that notice, and then must not remove the person until two federal election cycles have passed wherein the person may vote after confirming their address. 52 U.S.C. §§ 20507(d)(1)(A)–(B) (emphasis added). Further, read together with Section 8(a)(3)(A), removals of registered voters on the basis of a change of residence—i.e. no longer living in Kentucky—cannot occur unless the *registrant* requests removal, or the Section 8(d) notice-and-waiting period is followed. ECF No. 35, ¶¶ 22–35, 79; 52 U.S.C. §§ 20507(a)(3), 20507(a)(4), 20507(d).

KRS § 116.113(5) is deficient because it explicitly prevents Kentucky officials from engaging in the NVRA Section 8(d) notice-and-waiting period. Rather, once a Kentucky official has "receipt of notification" from an out-of-state official that a Kentucky registrant may have registered in another state, Defendants must remove the voter within five days. However, a "receipt of notification" is insufficient grounds by itself to remove a voter from the rolls without engaging in the Section 8(d) notice-and-waiting period. "Notification" from an official is neither a request of the registrant to be removed from the rolls nor a voter's written confirmation of a change in residence. The plain meaning of "notification" is "the act or an instance of notifying" or "a written or printed matter that gives notice" such as an email from one official to another. *See* "*notification*" Merriam-Webster.com, https://www.merriam-webster.com/dictionary/notification (last visited Apr. 2, 2025). "Notice" defined as a "warning or intimation of something" or as "the condition of being warned or notified." *See* "*notice*," Merriam-Webster.com, https://www.merriam-webster.com/dictionary/notice (last visited Apr. 2, 2025).

---

[5] Adequate notice must be provided by "a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address." 52 U.S.C. § 20507(d)(2).

"[A] fundamental canon of statutory construction is that when interpreting statutes, the language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear." *Saginaw Chippewa Indian Tribe of Mich. v. Blue Cross Blue Shield of Mich.*, 32 F.4th 548, 557 (6th Cir. 2022) (citations and quotations omitted). Here the language is clear and unambiguous: a voter's removal is triggered when an out-of-state official notifies a Kentucky official that a Kentucky registrant has registered in another state. If the Legislature intended removal to be based on anything more substantial than a mere notification, then the Legislature would have chosen different language when drafting the statute. *Norfolk S. Ry. Co. v. Perez*, 778 F.3d 507, 512 (6th Cir. 2015) ("[A court] must presume that Congress says what it means and means what it says") (citation omitted). For example, the Legislature could have enacted the following language: *upon receipt of an out-of-state registration form signed by a Kentucky registrant*. Indeed, other sections of KRS § 116.113 specify both the source of information required and the exact information required to initiate a voter's removal under the statute. For example, KRS § 116.113(1) requires removal following "receipt of notification from the Cabinet for Health and Family Services" ***and*** "[t]o ensure that the State Board of Elections accurately removes names from the voter registration records it maintains, the Cabinet for Health and Family Services shall provide a copy of the lifetime Kentucky death records to the State Board of Elections . . . ." KRS §§ 116.113(1)(a), (b).

While Defendants might be correct that notification *in conjunction with* a voter's signed out-of-state registration form could be sufficient to remove a voter within five days, notification by itself is insufficient. And under the challenged purge provision, removal is triggered by notification only—not by any supplemental materials that an out-of-state official might theoretically choose to provide in some cases as factual support for the notice. Thus, whether a

signed voter registration form might be considered a voter's request to be removed from the rolls (Section (a)(3)(A)) or as a voter's written confirmation of a change in residence (Section 20507(d)) is irrelevant. Immediate cancellation of registration under KRS § 116.113(5) is triggered by an out-of-state official's written "warning or intimation of something"—nothing more.

Even if Defendants' implementation hypothetical were relevant, it cannot defeat KFTC's facial challenge. *See League of Women Voters of Ind. v. Sullivan*, 5 F.4th 714, 726, 729 (7th Cir. 2021) (rejecting defendants' offer to adopt a saving construction, holding that the court "cannot read a silent requirement into [the challenged state law]" and noting that "[a] hypothetical factual scenario under which [the state law] would not conflict with the NVRA" does not necessarily defeat a facial challenge.).

### 2. The plain meaning of the purge provision mandates that Defendants remove voters without the safeguards required under the NVRA.

The challenged purge provision specifies that:

> [u]pon receipt of **notification from a local or state jurisdiction** that a voter has registered to vote in the new local or state jurisdiction outside of the Commonwealth, the State Board of Elections **shall within five (5) days** cause the removal of the name of that person from the voter registration records that it maintains, except that no voter's name may be removed during the period of time the registration books are closed for any primary, regular election, or special election.

KRS § 116.113(5) (emphasis added). Importantly, this statute mandates the removal of registrants upon notification **from an official** that a voter has registered to vote outside of Kentucky.[6] This is far afield from the NVRA's requirement that a state receive a *voter's* written confirmation that they have changed residences before summarily removing that voter from the rolls without completing the notice-and-waiting period process. ECF No. 35, ¶¶ 22–35, 79. Similarly, KRS § 116.113(5)

---

[6] Plaintiff's challenge is properly brought under Section 8(d), because the purge provision purports to only impact registrants who have registered elsewhere and thus have moved out of state.

does not require, as required by Section 20507(a)(3)(A), that Kentucky election officials receive and review a forwarded, affirmative "request" that the voter has signed seeking their removal from the rolls in their prior state of residence. *See League of Women Voters of Ind.*, 5 F.4th at 732 ("An authorization-of-cancellation form that a voter personally signs and that is then forwarded to Indiana from another state complies with section 20507(a)(3)(A) of the NVRA.").

Whether the signed registration form is treated as written confirmation or as a request of the registrant is irrelevant. The key issue is that KRS § 116.113(5) does not require Kentucky officials to review the out-of-state registration form to confirm the voter's identity before engaging in removal. ECF No. 35, ¶¶ 41, 80; *see infra* at 24–30. Because of the mandatory timeline for removal under this Kentucky law, Defendants *must* remove a voter who is the subject of a "notification" within five days *even* in the absence of either a voter's request or written confirmation. KRS § 116.113(5). If the challenged purge provision required Kentucky officials to review a voter's signed request or written confirmation of a change of residence, KFTC would not have filed this case, but the statute permits Kentucky officials to rely merely on another state officials' summary representations.

Furthermore, Defendants cite to no law, regulation, or even guidance to substantiate their claim that the voters removed under KRS § 116.113(5) must have "signed up in another state to vote there, and in that process told their new state where they were previously registered . . . trigger[ing] their removal from Kentucky's voter rolls." ECF No. 37-1 at 15. There is no legal basis for the conclusory assertion that their enforcement of KRS § 116.113(5) complies with Section 8(d) of the NVRA. Nor do Defendants point to any law, rule, or guidance to demonstrate that they interpret a "notification" from another state that a person has registered there, KRS § 116.113(5), to mean *only* a signed voter registration form with authorization of cancellation provided to

Kentucky. ECF No. 35, ¶ 41. And that is the sole factual predicate contemplated by the United States in its Statement of Interest to harmonize both the challenged law and Section 8(a)(3)(A) of the NVRA. ECF No. 39 at 4–5; ECF No. 35, ¶ 41.

Rather, KRS § 116.113(5) lacks any standard or procedure for how out-of-state officials or Kentucky officials must verify that a registered Kentucky voter listed in the "notification" is in fact the same person that has registered in the other state. ECF No. 35 ¶¶ 26, 80–81. No other cited legal authority supplies this process. Without such information, notifications pursuant to the challenged law do not serve as an NVRA-compliant confirmation or request directly from "the registrant." *Id.*; 52 U.S.C. §§ 20507(a)(3)(A), 20507(d)(1)(A). Moreover, nothing in the challenged statute safeguards against Kentucky officials' reliance on erroneous information from out-of-state officials as "notification" such as the (now-defunct) Interstate Cross Check system, the use of which in Indiana was enjoined under similar circumstances and on similar legal grounds. ECF No. 35 ¶¶ 26, 80; *see Common Cause Indiana v. Lawson*, 937 F.3d 944, 958 (7th Cir. 2019); *League of Women Voters of Ind.*, 5 F.4th at 724.[7] KRS § 116.113(5) is unambiguous: if an out-of-state official merely notifies Defendants that a Kentucky voter has registered in another state, then they must act to remove that voter from the rolls. ECF No. 35 ¶¶ 26, 31–35, 79–81. In the absence of any duly promulgated rule or regulation, this removal is seemingly accomplished without following the NVRA's required safeguards that help ensure the individual removed is in fact the same person whom out-of-state officials believe has moved and registered outside Kentucky. *Id.*

---

[7] Moreover, KRS § 116.113(5) does not even require that the official who sends the notification be from the same jurisdiction of the voter's new registration. Rather the statute precisely states "[u]pon receipt of notification from *a local or state jurisdiction* that a voter has registered to vote in *the new local or state jurisdiction outside of the Commonwealth.*" KRS § 116.113(5) (emphasis added). Thus, it is entirely possible that a Texas official could notify a Kentucky official that a Kentucky voter has registered in Ohio or Arizona based on an unreliable interstate crosscheck system or inaccurate information provided by a third party.

KRS § 116.113(5) only requires Kentucky officials to receive mere notice of registration in another state, *i.e.* nothing more than a state-to-state voter list comparison report or the transmission of a bare list of names. *Id.*, ¶¶ 26, 31–35. These "notification[s]" would be consistent with state law but run afoul of the NVRA. *Id.*, ¶¶ 86–88, 91. Indeed, notification by out-of-state officials could be premised on a faulty interstate system relying upon faulty comparisons of voters' information across different states' databases with inadequate matching criteria, an out-of-state official's erroneous belief that the registered Kentucky voter is in fact the same person listed on another state's rolls, erroneous information regarding which state's registration record is the more recent for the voter, or even erroneous information provided by a third party. *Id.*, ¶¶ 26, 80–81. All these circumstances demonstrate why the NVRA must be construed to require the prior state's election officials to review a registrant's written confirmation or request themselves, rather than rely on a mere representation or incomplete data from another state.

At bottom, KRS § 116.113(5) lacks guardrails to ensure that the "notification" fulfills the NVRA protections intended to ensure that voters who remain eligible remain registered. *Id.* Given the challenged law's plain language, if Defendants receive a notification from an official that a voter has registered elsewhere, Defendants *must* act to remove the person and quickly. *Id.*, ¶¶ 79–81. Specifically, once bare "notification" is received, the voter *must* be removed from the rolls within five days, rather than allowing for time to fulfill any of these alternative NVRA requirements: written confirmation from the voter of a change in address, the notice-and-waiting-period, or a signed removal request. *Id.*; 52 U.S.C. §§ 20507(d)(1)(A)–(B), 20507(a)(3)(A).

### 3. Defendants' assumptions and factual assertions outside the four corners of the First Amended Complaint are unavailing.

Defendants argue that the process under KRS § 116.113(5) is NVRA-compliant by relying on unsubstantiated factual assertions and assumptions that are outside the four corners of the

operative complaint. Particularly in ruling on a motion to dismiss, this Court cannot presume, as Defendants would have this Court do, that the only reason an out-of-state official notifies a Kentucky election official is because of a voter's signed out-of-state registration form. Defendants have provided no legal or factual support for this assertion.[8] ECF No. 35, ¶ 41; ECF No. 37-1 at 15. The Court cannot credit the Defendants' unsubstantiated factual assertions in support of their Rule 12(b)(6) motion to dismiss, because the Court is limited to a review of the four corners of the complaint.[9] *Berry*, 832 F.3d at 637–38. Within those four corners, Plaintiff alleges that the language of KRS § 116.113(5) facially violates the NVRA, because it requires only an out-of-state official's mere notification, as in a summary warning that a voter has registered elsewhere, to require the voter's removal in five days. ECF No. 35, ¶ 26.

Moreover, in its as-applied challenge, KFTC has also plausibly alleged facts suggesting that Defendants are removing registrants under KRS § 116.113(5) without first reviewing the registrant's written confirmation or request for removal. No law, regulation, or guidance document has been marshalled to contradict these factual allegations that must, in any event, be construed in

---

[8] Without fact discovery, it is impossible for the Court to evaluate how Defendants are implementing the challenged purge provision. Defendants' argument would be appropriate for summary judgment but not here, where the Court is only reviewing the complaint's sufficiency.

[9] KFTC disputes Defendants' claim that a voter's removal is only triggered by a signed registration form. Further, Defendants' argument that "[t]he NVRA['s] text does not limit how or to whom 'the registrant – confirms in writing'" is unpersuasive. ECF No. 37-1 at 14; *see* ECF No. 38 at 23. On the contrary, the NVRA's language strongly indicates that Defendants cannot simply rely on the word of an out-of-state official to initiate a removal. For example, a closely related provision in the NVRA requires that when an election official receives a notice from the U.S. Postal Service that a voter has changed their address to another jurisdiction, the election official must nevertheless follow Section 8(d)(2)'s notice-and-waiting procedure before removing the voter. 52 U.S.C. § 20507(c)(1)(B)(ii). Nothing in the NVRA contemplates that an official could immediately cancel a voter's registration based on a document that an official never even reviewed. *See Abramski v. United States*, 573 U.S. 169, 179 (2014) (noting Court "must (as usual) interpret the relevant words not in a vacuum, but with reference to the statutory context, structure, history, and purpose") (citation omitted); *Richards v. United States*, 369 U.S. 1, 11 (1962) (stating it is "fundamental that a section of a statute should not be read in isolation from the context of the whole Act").

Plaintiffs' favor. *Id.*, ¶ 41; *see infra* at 24–30. Accordingly, for the purposes of the motion to dismiss, Defendants' implementation-based allegations are meritless and should be rejected by the Court.[10] KFTC has stated a valid claim for facial invalidation of KRS § 116.113(5).

**b.  Additionally, KFTC has stated a valid claim for an as-applied declaratory and injunctive relief under the NVRA.**

KFTC has also plausibly alleged facts demonstrating that Defendants are removing registrants under KRS § 116.113(5) without first reviewing the registrant's written confirmation or request for removal in support of alternative as-applied declaratory and injunctive relief. Even if this Court were inclined to dismiss KFTC's facial federal preemption challenge, KFTC has also stated an as-applied challenge against Defendants' enforcement of the purge provision. ECF No. 35, ¶¶ 68, 91, Prayer for Relief (A). Defendants have raised no argument to counter Plaintiff's as-applied challenge to their enforcement of KRS § 116.113(5)—an independent, alternative basis for relief in this case. Even if KFTC's facial challenge is dismissed, Plaintiff has plausibly alleged an as-applied challenge that should move forward to discovery and summary judgment.

In its First Amended Complaint, KFTC asserts that Defendants' enforcement of the purge provision has resulted in the wrongful removal of dozens of individuals who were served by KFTC's voter engagement programming. ECF No. 35, ¶¶ 57–61. Each of these individuals was an eligible Kentucky voter who had the right to be registered in Kentucky and the right to vote in Kentucky elections. *Id.*, ¶ 63. No law, regulation, or guidance document has been marshalled to contradict these factual allegations that demonstrate non-compliance with the NVRA in enforcing KRS § 116.113(5) and must be construed in Plaintiffs' favor. *Id.*, ¶ 41.

---

[10] Nothing precludes Defendants from gathering facts to raise this argument at summary judgment.

KFTC has plausibly alleged that Defendants have wrongfully removed voters via a non-NVRA-compliant procedure and thus denied these voters its protections. *Id.*, ¶ 65. KFTC has alleged that Defendants have likely removed voters based on phone calls from out-of-state officials or purge lists submitted by out-of-state officials, *id.*, ¶ 26 and n.4, and violated the NVRA by removing voters within five days even without a written confirmation of the voters' change in address. *Id.*, ¶ 34. These wrongfully purged voters should have but did not receive any notice of Defendants' belief that they were ineligible and should have been able to avail themselves of the opportunity within the federal statutory waiting period to present themselves to vote, confirm their correct Kentucky address, and remain on the rolls. *Id.*, ¶¶ 57–63.

Defendants have implemented removal procedures that violate the NVRA and significantly interfere with KFTC's core organizational activities. *Id.*, ¶¶ 43–75, 85–87. For this reason, KFTC has, in the alternative, asked the Court to rule that Defendants' enforcement of the purge provision violates the NVRA. *Id.*, ¶ 91, Prayer for Relief (A). Specifically, KFTC has asked this Court to declare that Kentucky officials must conduct "a first-hand review of a Kentucky voter's written confirmation that they have moved to another state" before removing a voter under the purge provision. *Id.*, ¶ 91. And KFTC has asked the Court to enjoin Defendants' practice of removing voters without first reviewing the voters' written confirmation of a change of residence. *Id.* The distinction between facial and as-applied challenges can be elusive, where one hundred percent of Defendants' applications of a challenged law are preempted by federal law. Nonetheless, this Court need not determine what percentage of Defendants' applications of KRS § 116.113(5) violate the NVRA, as KFTC has alleged facts that plausibly establish non-compliance and, therefore, have stated an alternative claim for as-applied relief.

The United States submitted a Statement of Interest, ECF No. 39, attacking KFTC's facial challenge but ignoring its request for as-applied declaratory and injunctive relief in the alternative. Sidestepping Plaintiff's Section 8(d) argument entirely, the United States argues instead that "Section 8(a)(3)(A) provides an independent basis for removal 'at the request of the registrant,' including where an individual registers to vote in a second state and that state forwards the form to the individual's first state of registration for removal." ECF No. 39 at 10–11. However, the United States's argument rests on dubious assumptions regarding Defendants' enforcement of the challenged purge provision or, at best, Defendants' mere say-so. As recounted above, the First Amended Complaint plausibly alleges that Defendants' *actual implementation and enforcement* of KRS § 116.113(5) violates the NVRA. ECF No. 35 ¶¶ 56–61, 68, 86–88, 91.[11] At the motion to dismiss stage, where KFTC's factual allegations must be construed in its favor and given the absence of any clarifying law or regulations on this purge scheme, neither Defendants nor the United States have any basis to assert that 100 percent of Defendants' applications of KRS § 116.113(5) comply with the NVRA.

Only a few courts have directly addressed what is required to trigger a removal pursuant to a "request of the registrant" under Section 8(a)(3)(A). Most significantly, the Seventh Circuit addressed this question in a pair of cases. First, in *Common Cause Indiana*, the Seventh Circuit affirmed a preliminary injunction against implementation of an Indiana law that "allow[ed] Indiana immediately to remove a voter based on information received from a third-party database rather than in response to direct contact with the voter." 937 F.3d at 946. Analyzing the requirements under Section 8(a)(3)(A), the Seventh Circuit was particularly troubled by the fact that the state

---

[11] While the United States asserts a "substantial interest in ensuring that the NVRA is properly interpreted and uniformly enforced," ECF No. 39 at 1, its interpretation contradicts recent Seventh Circuit rulings and, if adopted here, would result in non-uniform enforcement.

law "omit[ted] any direct contact with the voter whose name has been flagged" and that county election officials were required to immediately remove a voter from the rolls "based exclusively on the official's unilateral assessment that the alleged 'match' is accurate—that is, that the person registered in State X is the same as the person registered in Indiana, and that the State X registration is more recent." *Id.* at 958. The Court highlighted that removal "at the request of the registrant" under Section 8(a)(3)(A) "focus[es] on direct contact with the voter." *Id.* at 959. Even if Section 8(a)(3)(A) provides an independent basis to remove Kentucky registrants, ECF No. 39 at 5, *Common Cause Indiana* says that is so only in very specific circumstances when there is direct contact with the voter. The United States does not contend that actual implementation of the purge provision satisfies these circumstances.

Moreover, in a subsequent appeal from the same case, the Seventh Circuit further clarified "direct" contact with a voter and allowed removals when an Indiana county official had *in hand* a copy of the voter's out-of-state registration form and that form specifically included a spot for the voter to authorize the prior registration's cancellation expressly. *League of Women Voters of Ind.*, 5 F.4th at 720. The United States focuses on the fact that, in these extremely limited circumstances, the Seventh Circuit allowed for removals based on out-of-state registration. ECF No. 39 at 10. But that holding does not save KRS § 116.113(5) because the text of Indiana's statute included specific and significantly stronger safeguards, including that the county election official *have a copy* of the registration form containing the voter's *express authorization of cancellation* before completing the removal. *See League of Women Voters of Ind.*, 5 F.4th at 720.

What Indiana was proposing to comply with the NVRA is materially different from the implementation Kentucky now asks this Court to rubberstamp. For one, the state law at issue allowed for immediate removal only if the county official was able to make three determinations:

(1) whether the presumptive match in another state "is the same individual who is a registered voter of the county";

(2) whether the registration in the second state occurred after the presumptively matching Indiana registration; and

(3) whether the voter in question "authorized the cancellation of any previous registration" when the voter registered in the second state.

*Id.* at 719. If all three requirements were satisfied, county election officials were directed to cancel the voter's registration. *Id.* at 720. If only the first two were satisfied, county officials were instructed to begin the notice-and-waiting procedures delineated by the NVRA. *Id.* The appeal focused on how to determine whether the third requirement was satisfied. *Id.* at 719. At the time, only nine other states had a spot on their voter registration forms where the new registrant could expressly "authorize the cancellation of any prior registration she may have." *Id.* There were two paths for satisfying the third requirement, one of which stated that the information proving authorization of cancellation could be provided to the Indiana county official from the other state but the other state would need to "provide a copy of the voter's signed voter registration application." *Id.* at 720.[12] Seeking clarity on the Seventh Circuit's prior use of the phrase "direct contact" in *Common Cause Indiana*, Indiana officials wanted to know if it was "enough for the voter to submit the [authorization of cancellation on the voter registration] form to the new state and trust it to convey the form back to Indiana," instead of Indiana receiving the forms "directly from voters." *Id.* at 731–32. The Seventh Circuit found this procedure permissible under 52 U.S.C. § 20507(a)(3)(A) where the "voter personally signs [the form] and that is then forwarded to Indiana

---

[12] In focusing on what the Seventh Circuit did allow, the United States downplays that it also invalidated a provision of the law whose defects resemble the Kentucky purge provision. The Court found that the other path for satisfying the third requirement was preempted by the NVRA because it "requires county officials to *presume* that a voter has authorized cancellation of her registration any time they are sent a presumptive match, *even if Indiana has not received an authorization of cancellation from the voter*." *League of Women Voters of Ind.*, 5 F.4th at 727 (emphasis in original) (noting that this provision "reestablishes the precise scheme we found wanting in [*Common Cause Indiana*, 937 F.3d 944].").

from another state." *Id.* at 732. This constituted "direct" contact with a voter because it was "*generated by the voter*," and not by a third party. *Id.*

However, the United States puts weight on the Seventh Circuit's limited holding that it cannot bear. The United States argues that if KRS § 116.113(5) does not *prohibit* taking the (theoretical) action that would bring Kentucky's scheme into compliance with the NVRA (*i.e.*, electronic transmission or mailing of the forms), this Court should reject Plaintiff's facial challenge. *See* ECF No. 39 at 10–11. But "a hypothetical factual scenario under which [the state law] would not conflict with the NVRA" does not necessarily defeat a facial challenge. *League of Women Voters of Ind.*, 5 F.4th at 729. And it of course cannot defeat an as-applied challenge. This is especially true when Defendants have never even argued that they are uniformly implementing the law consistent with the hypothetical scenario. *See id.* (rejecting hypothetical because it is incompatible with rest of the law and would undermine law's operation). Defendants have never argued that KRS § 116.113(5) is similar in form or function to the Indiana law that allowed for cancellation only when the county official had a copy of the registration form forwarded to them. This is the only adjustment that would bring KRS § 116.113(5) into compliance, and that is why KFTC seeks as-applied declaratory or injunctive relief as to its unlawful enforcement.

In fact, Defendants may well have been able to resolve this lawsuit months or even years ago if they had clarified their implementation and committed to reviewing registrants' signed out-of-state forms themselves before initiating removal. ECF No. 35, ¶ 41. Instead, Defendants have been vague and evasive regarding the statute's implementation. *Id.*, ¶¶ 41–42. The State Board of Elections merely says that "KRS 116.113(5) requires that a registrant be removed from the voter rolls when that registrant has registered to vote in another state," ECF No. 38 at 20, and "[r]egistering to vote in another jurisdiction is written confirmation that the registrant has changed

residence to a place outside the jurisdiction in which the registrant had been registered." *Id.* at 23. For his part, Secretary Adams says only that "a voter can satisfy the 'written confirmation' requirement of the NVRA by registering to vote in a new state." ECF No. 37-1 at 2. However, Plaintiff's allegations plausibly establish that Defendants' enforcement of KRS § 116.113(5) does not comply with the NVRA, because a number of voters purged pursuant to the challenged provision subsequently re-registered to vote in Kentucky. ECF No. 35, ¶¶ 59–61. Furthermore, unless and until Defendants demonstrate at the appropriate stage of litigation that the actual implementation comports with the lawful interpretation that they are presenting to the Court, this Court should not give any credence to their argument.

*               *               *

For all the reasons above, KFTC has stated valid claims for facial and as-applied violations of the NVRA upon which this Court may grant relief.

## III.   Conclusion

Accordingly, Defendant's Motions to Dismiss should be denied. Lastly, pursuant to Local Rule 7.1(f), Plaintiff respectfully requests oral argument regarding Defendants' Motions to Dismiss.

Dated: April 3, 2025

Respectfully submitted,

/s/Beauregard W. Patterson

Jackson Cooper
Kentucky Bar No. 94297
Kentucky Equal Justice Center
201 West Short Street, Ste. 310
Lexington, KY 40507
jackson@kyequaljustice.org
Phone: (502) 303-4062

Michelle Kanter Cohen*
(D.C. Bar No. 989164)
Beauregard William Patterson*
(WI State Bar No. 1102842)
Fair Elections Center
1825 K Street NW, Ste. 701
Washington, DC 20006
mkantercohen@fairelectionscenter.org
bpatterson@fairelectionscenter.org
Phone: (202) 331-0114

*Admitted Pro Hac Vice

*Counsel for Plaintiff Kentuckians for the Commonwealth*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that the foregoing was filed on this 3rd day of April, 2025 through the federal Case Management Electronic Case Filing (CM/ECF) system, which will generate a notice of electronic filing (NEF) to all users who have registered in this action:

Taylor Austin Brown
General Counsel
State Board of Elections
140 Walnut Street
Frankfort, KY 40601
Taylora.brown@ky.gov

Carmine Iaccarino
Sturgill Turner
333 West Vine Street, Ste. 1500
Lexington, KY 40507
carmine@sturgillturner.com

R. Kent Westberry
Bridget M. Bush
W. Wood Brown
Landrum & Shouse LLP
220 W. Main Street, Ste. 1900
Louisville, KY 40202
kwestberry@landrumshouse.com
bbush@landrumshouse.com
wbrown@landrumshouse.com

Jenni Scutchfield
Assistant Secretary of State
General Counsel
700 Capital Ave., Ste. 152
Frankfort, KY 40601
jscutchfield@ky.gov

/s/ Beauregard W. Patterson