IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| KENTUCKIANS FOR THE COMMONWEALTH, <br><br> *Plaintiff*, <br><br> v. <br><br> MICHAEL G. ADAMS, in his official capacity as the Secretary of State for Kentucky, *et al.*, <br><br> *Defendants*. | Civil Action No. 3:24-cv-387-BJB |

**DEFENDANT SECRETARY OF STATE MICHAEL G. ADAMS' REPLY IN SUPPORT OF HIS MOTION TO DISMISS AMENDED COMPLAINT**

Plaintiff Kentuckians for the Commonwealth ("KFTC") has still failed to point to a concrete, particularized injury-in-fact to it as an organization. It therefore lacks Article III standing and this suit must be dismissed for lack of jurisdiction.

The Court need not reach the merits, but if it does, Secretary of State Michael G. Adams agrees with the U.S. Department of Justice in its Statement of Interest, Dkt. 39: there is no conflict between KRS §116.113(5) and the federal National Voter Registration Act of 1993, 52 U.S.C. §§20501 – 20511("NVRA"), and hence no preemption.

**INTRODUCTION**

KFTC continues to cling to *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), even though the Supreme Court of the United States has limited it to its facts. As Professor Josh

1

Blackman noted,[1] *Havens Realty* resembles the *Lemon* test in its final days. Justice Scalia's description of *Lemon's* demise could well apply to Plaintiff's incantation of *Havens Realty*: "Like some ghoul in a late-night horror movie that repeatedly sits up in the grave and shuffles abroad. After being repeatedly killed and buried," it continues to stalk. *See Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist*., 508 U.S. 384, 398 (1993) (Scalia, J., concurring).

KFTC abandoned its attempt to sue on behalf of its members after the Court dismissed its first complaint; it now claims injury solely to itself as an organization. Nevertheless, KFTC requested, and the State Board of Elections ("SBE") provided, the names of more voters who have been purged since KFTC began this odyssey, as the process to keep voting rolls accurate is ongoing. KFTC still cannot identify even one member who was wrongfully purged under KRS §116.113(5). To be sure, it claims that a dozen people with whom it interacted in its "voter engagement programs" were purged as non-residents, then reregistered and voted in Kentucky. But it pleads no facts about the circumstances to negate the equally plausible explanation that sometimes people move away from Kentucky and then change their mind. Many people used COVID as an opportunity to "work from home" – on a beach. Employers are calling them back. Sarah Paynter, *Meet the Homeowners Who Have Had Enough of Their Covid Relocation Dreams*, Wall St. J. (March 25, 2025), https://www.wsj.com/real-estate/luxury-homes/covid-homes-relocation-e2acfa9f?st=FwAR6D.

KFTC purports to plead three types of injuries. First, it alleges that it has wasted its resources by registering and/or conducting Get Out the Vote ("GOTV") activities on people who were purged from Kentucky's voter rolls. Second, it claims that it has spent money on education and training to address the changes from KRS §116.113 (5). Both of these injuries fall under the

---

[1] Josh Blackman, The Standing Analysis in *FDA v. Alliance for Hippocratic Medicine*, Volokh Conspiracy (June 16, 2024).

ambit of *Havens Realty* "diversion of resources." Third, it alleges that its reputation will be harmed by Defendants applying the law, KRS §116.113 (5) – that the public will for some reason blame KFTC, rather than Defendants.

## ARGUMENT

I. **KFTC has failed to plausibly allege that it as an organization has been concretely injured by Defendants' implementation of KRS §116.113(5).**

A. **KFTC wants this Court to not just apply but actually extend *Havens Realty*.**

KFTC misreads *Havens Realty*'s application to organizational standing in the post-*Alliance for Hippocratic Med.* world. *Havens Realty* is distinguishable for at least three reasons.

First, in *Havens Realty*, there was false information – not just information of dubious reliability, or inaccurate information, but deliberately false information. The *Havens Realty* organizational plaintiff, HOME, suffered an Article III injury based on the defendant lying to HOME's employee. Plaintiff's employee was denied housing after a direct inquiry at the defendant's apartment complex in violation of the Fair Housing Act. *Havens Realty*, 455 U.S. at 368. As a result, the Supreme Court found that the organizational plaintiff, HOME, had suffered an informational injury because it had to divert resources to counteract *false information*. *Id.* (internal citations omitted).

The Supreme Court only found organizational standing in *Havens Realty* because the "tester" plaintiff was affirmatively misled when she was told that no housing was available. 455 U.S. at 373-74. Last term, the Supreme Court analogized *Havens Realty's* reasoning to a "retailer who sues a manufacturer for selling defective goods to the retailer". The false information was the equivalent of a defective product. *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 395 (2024).[2]

---

[2] KFTC's reliance on *Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC*, 124 F.4th 990, 992 (6th Cir. 2025)

3

Here in contrast, KFTC has at most pled allegations of inaccurate information – that voters may be erroneously purged based on a voter with the same name, who may have moved out of Kentucky and registered to vote in their new state. That is, as KFTC conceded at the January 27, 2025 oral argument, the concern here is the "mistake cases". Transcript of Oral Argument at 14-15, *Kentuckians for the Commonwealth v. Michael G. Adams, et al.*, No. 3:24-cv-00387-BJB-RSE (W.D. Ky. Jan. 27, 2025 (Dkt. 31); *see also* Dkt. 35 at ¶¶ 57-60.

Mistakes happen. The Sixth Circuit has held that there is no right to a perfect election. The "ever present possibility than an election worker will make a mistake" is not imminent enough to constitute a cognizable injury. "No injury may occur at all." *Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 981 (6th Cir. 2020) (per curium).

The plaintiff organization in *Alliance* had a similar concern about the reliability of government studies on mifepristone. The plaintiffs there did not allege that the FDA had lied to them or given them false information, just that they did not trust the government to "properly collect and disseminate information." *All. for Hippocratic Med.*, 602 U.S. at 395 (cleaned up). Therefore, the organization argued that it was forced to do its own studies and inform the public, resulting in a diversion of resources. The *Alliance* medical association plaintiffs argued that the FDA's deregulation of the abortion drug mifepristone "caused" the associations to "study the drug" and "gather information" to "inform their members and the public about mifepristone's risk." *Id.* at 394. The Supreme Court unanimously rejected that attempt by the organization to spend its way into standing. The nature of the "information" at issue here is analogous to *Alliance* and

---

is misplaced; it too was a false information case in the fair housing context like *Havens Realty*. The Sixth Circuit noted that the Michigan District Court's original decision was made before *Alliance*. As such, the Court remanded the case for further proceedings in light of *Alliance*.

distinguishable from *Havens Realty*.³

Second, *Havens Realty* is also distinguishable because the false information flowed directly from the *Havens Realty* defendant to the organizational plaintiff's employee. *Havens Realty*, 455 U.S. at 368. Here, in contrast, KFTC complains about information flowing from officials in other states to Defendants. *See, e.g.,* Dkt. 35 at ¶¶ 26 n.4, 84; *see also* Transcript of Oral Argument at 15 (Dkt. 31) ("There are concerns that we have about the ability of out of state officials to help in-state officials make a reliable match on a voter."). There is no allegation that the out of state election officials gave any information to KFTC itself.

Third, *Havens Realty* held that the organizational plaintiff had standing to pursue monetary damages. *See Havens Realty,* 455 U.S. at 371.⁴ *Havens Realty* was a monetary damages case. The Sixth Circuit has made clear that standing to seek damages does not, by itself, equate to standing to seek an injunction. *Fair Elections Ohio v. Husted,* 770 F.3d 456, 460 n.1 (6th Cir. 2014); *Lee,* 105 F. 4th at 903-04. KFTC does not seek money damages, and *Havens Realty* by itself does not confer standing for declaratory or injunctive relief. This Court should reject KFTC's implicit invitation to extend *Havens Realty* to injunctions.

KFTC "cannot satisfy the demands of Article III by alleging a bare procedural violation[,]" without more. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 342 (2016). Claims for declaratory and injunctive relief for alleged future harm in relation to a potential procedural violation must be sufficiently "real and immediate" to show that there is a "threat of repeated injury." *L.A. v. Lyons*, 461 U.S. 95, 102 (1983). "Abstract injury is not enough[,]" and KFTC must show that it has

---

³ The Supreme Court in *Alliance* specifically noted (twice) that *Havens* was a "false information" case. *All. for Hippocratic Med.*, 602 U.S. at 395.

⁴ The *Havens Realty* plaintiff, HOME, entered into a settlement with the defendants prior to the Supreme Court's ruling effectively rendering HOME's claims for injunctive relief moot. 455 U.S. at 366; *see also Tennessee Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Lee*, 105 F.4th 888, 903 (6th Cir. 2024) (per curiam).

"'sustained or is immediately in danger of sustaining some direct injury" as the result of the challenged official conduct and the injury or threat of injury must be both "real and immediate" not "conjectural" or "hypothetical."' *Id.* at 101-02 (internal citations omitted). KFTC has failed to meet its burden to adequately demonstrate real and immediate harm of future injury because of KRS §116.113(5)'s enforcement. Without real and immediate harm of future injury, KFTC cannot gain declaratory and injunctive relief.

KFTC states that at least "12 of its members… who were served by KFTC's voter engagement programs, were illegally and erroneously purged" from Kentucky's voter rolls. Dkt. 35 at ¶ 59. KFTC then admits that these 12 individuals voted in the Kentucky 2024 election cycle. *Id.* at ¶ 60. The very allegation that people were improperly purged is a "conclusory allegation or legal conclusion masquerading as a fact." *Lawson v. Hargett*, 2024 U.S. Dist. LEXIS 147570, *16 n.11 (M.D. Tenn. Aug. 19, 2024) (cleaned up). Like the League of Women Voters in *Lawson*, KFTC's "alleged impediment is much closer to the medical associations' purported injury in [*Alliance*] than it is to the plaintiff's injury in *Havens* because (for reasons stated above) it does not directly affect and interfere with [KFTC's] core activities of helping [Kentucky] citizens register to vote, educating voters about the issues that impact them, and encouraging voters to be active participants in democracy." *Id.* at *48 (emphasis added).

### B. KFTC's "reputational injury" is so remote and speculative as to be spurious.

KFTC frames this as a future injury – that "as KRS §116.113(5) ensnares eligible voters who registered through Plaintiff's voter registration program, KFTC *will* also suffer severe reputational harm in the communities where it has worked and continues to work to secure trust so that it can fulfill its core mission." Dkt. 35 at ¶ 70 (emphasis added). It goes on to state that voters will attribute any errors in implementation of KRS §116.113 to KFTC, rather than

6

Defendants: "community members whom KFTC has assisted will come to distrust KFTC, wrongly thinking that its canvassers did not provide correct information, guidance, and assistance, or even that their applications were submitted incorrectly." *Id.* at ¶ 73. KFTC then extrapolates: "These negative outcomes will also severely undermine voters' *faith and trust in the electoral system*, thereby undermining Plaintiff's mission to promote and foster sustained civic engagement among low-propensity voters and in underrepresented communities throughout Kentucky." *Id.* (emphasis added). In sum, KFTC "foresees a loss of trust and a chilling effect on voter participation in the communities it serves." *Id.* at ¶ 75.

Who is to say how third parties not before the Court will react to an event that might never even happen? KFTC wants the Court to accept the hypothetical in place of the requirement of a concrete and particularized injury that has occurred or is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Those twelve people that KFTC alleges were erroneously purged – there is no allegation that any of them blame KFTC for whatever happened. To the contrary, the more plausible inference is that voters who are erroneously stricken from the rolls would blame Defendants. To the extent that the past is predictive of the future, KFTC's fear about its reputation is speculative. *See Lee*, 105 F.4th at 902. ("But since we have no idea how often that policy has affected the NAACP in the past, how can we decide whether such a future injury is 'certainly impending.'"); *Id.* (citing *Clapper,* 568 U.S. at 409).

The reference in KFTC's Amended Complaint to "faith and trust in the electoral system" is a generalized policy grievance, which Article III standing forecloses. *See, e.g.*, *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014). And those concerns for the election system itself are common to all residents; they are not "particularized"

7

as to KFTC. *Spokeo,* 587 U.S. at 339. KFTC's "mere interest in a problem cannot confer standing." *Lawson* 2024 U.S. Dist. LEXIS at *35 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)). KFTC's fear of reputational harm is the sort of "psychic injury [that] falls well short of a concrete harm needed to establish Article III standing." *Glenborough Homeowner's Ass'n v. United States Postal Serv.,* 21 F. 4th 410, 415 (6th Cir. 2021).[5]

## II.     KRS §116.113(5) does not violate the NVRA.

If the Court does reach the merits of Defendants' 12(b)(6) motions, the Amended Complaint fails to state a claim as a matter of law for the reasons addressed, *inter alia*, in the Department of Justice's Statement of Interest, Dkt. 39, and in Defendants' previous Motions and Replies. Dkt. 16, 17, 26, 27. Properly read, the text of KRS §116.113(5) does not conflict with the NVRA, as the federal statute's legislative history confirms.

The *Twombly/Iqbal* plausibility standard requires the Court to "draw on its judicial experience and common sense." *Republican Nat'l Comm. v. Benson,* 2024 U.S. Dist. LEXIS 192714, *19 (W.D. Mich. Oct. 22, 2024), appeal docketed, No. 24-1985 (W.D. Mich. Mar. 11, 2025) (Dkt. 21); *Clark v. Stone*, 998 F.3d 287, 298 (6th Cir. 2021). KFTC has made some misstatements and assumptions that defy experience and common sense.

For example, KFTC repeatedly refers to Defendants removing voters from Kentucky's rolls based on "unconfirmed" information. Dkt. 35 at ¶¶ 1, 4, 5, 10, 11. KFTC bears the burden to plausibly allege facts to support its assertions. No one expects KFTC to adduce actual evidence, but that does not excuse it from failing to allege enough facts to plausibly flesh out its claim. KFTC has alleged no facts to support its conclusion that Defendants are relying on "unconfirmed" information to perform their duties. It never alleges a basis for this assumption.

---

[5] KFTC did not cite any purported authority to support its "reputational injury."

Likewise for the assertion that a "mere phone call" may be enough to mandate SBE to cancel a voter's registration. Dkt. 35 at ¶ 26 n.4 ("A mere phone call or the submission of a purge list from an out-of-state election official, with no documentation to support the purge, *may* be enough to mandate the Board to cancel a voter's registration.") (emphasis added). KFTC has not – because it cannot – allege any facts that this has ever occurred. It has leapt from the hypothetical, and the speculative, to the imaginary. To be sure, nothing in the text of KRS §116.113(5) addresses phone calls. However, it does not follow that in the absence of a statutory prohibition on interstate phone calls between election officials, that such phone calls are even taking place – let alone to disenfranchise voters.

KFTC implies through careful phrasing, but never pleads facts, that it has re-registered the twelve people it claims were erroneously purged. *See* Dkt. 35 at ¶ 61 ("Because of Defendants' violations of the NVRA, these individuals were wrongfully purged from the voter rolls and needlessly forced to register."); *see also id.* at ¶ 66 ("Inevitably, [KFTC] *will* be forced to waste time and money re-registering voter who should never have been removed from the rolls") (emphasis added); *see also* Dkt. 42 at 8. Read closely, these allegations suggest that KFTC has not, to date, re-registered anyone: it is just speculating that in the future, it might need to. Those 12 voters KFTC keeps mentioning may well have – indeed probably – re-registered themselves; that is exactly what the cure process enacted at KRS §116.113(6) is designed to facilitate.

KFTC also incorrectly implies that voters might be erroneously stricken from the rolls too late to correct their status. That implication is contradicted by the 90-day quiet period that the NVRA imposes in the months before an election. NVRA §8(2)(2), Moreover, Kentucky's cure process expressly addresses the situation and provides a way for the voter to get relief:

> *If the protest is filed while the registration books are closed and the county board decides in favor of the protesting voter, the county board shall issue*

> *the voter an "Authorization to Vote" for the upcoming election and the voter's record shall be restored when the registration books open following the election.*

KRS §116.113(6).

With respect to the cure process, KFTC complains that "a voter can only initiate the cure process "*[f]ollowing* the purge of [the voter's] name from the records of the State Board of Elections.'" Dkt. 35 at ¶ 27 (emphasis added). It is a bizarre factual allegation, because if a voter could initiate the cure process *before* being purged, that would seem to allow the voter to appear on the rolls twice – exactly the inaccuracies that KRS §116.113 and the NVRA are meant to prevent.

Finally, KFTC's Amended Complaint is internally contradictory. It alleges that those voters with whom it interacted are "unlikely to discover that they have been purged until attempting to vote before the election." Dkt. 35 at ¶ 29. That cannot be reconciled with KFTC's repeated allegations of all the resources it has expended to teach people to monitor their registration and correct any mistakes. Dkt. 35 at, *e.g.*, ¶¶ 50, 54, 58.

## **CONCLUSION**

This is KFTC's second attempt to challenge a statute that was enacted four years ago. Even after a tutorial from the Court on the requirements of standing, and even after permission to try again, it has still failed to plausibly allege facts to show a concrete, particularized injury to it as an organization that flows from Defendants applying KRS §116.113(5) and the NVRA to keep Kentucky's voter rolls clean and accurate. Enough already. KFTC's Amended Complaint should be dismissed with prejudice. It would be futile to give it leave to try a third time.

Respectfully Submitted,

 */s/ R. Kent Westberry*
R. Kent Westberry
Bridget M. Bush
W. Wood Brown
kwestberry@landrumshouse.com
bbush@landrumshouse.com
wbrown@landrumshouse.com
LANDRUM & SHOUSE LLP
220 W. Main Street
Suite 1900
Louisville, KY 40202
(502) 589-7616


/s/ Jenni Scutchfield
jscutchfield@ky.gov
Assistant Secretary of State
General Counsel
700 Capital Avenue, Suite 152
Frankfort, KY 40601
*Counsel for Michael G. Adams, in his official capacity as the Secretary of State of Kentucky*

## **CERTIFICATE OF SERVICE**

It is hereby certified by undersigned counsel that the foregoing was filed on this 17th day of April 2025 through the federal Case Management Electronic Case Filing (CM/ECF) system, which will generate a notice of electronic filing (NEF) to all users who have registered in this action:

Taylor Austin Brown
General Counsel
State Board of Elections
140 Walnut Street
Frankfort, Kentucky 40601
TaylorA.Brown@ky.gov

Carmine Iaccarino
Sturgill Turner
333 West Vine Street, Suite 1500
Lexington, KY 40507-1681
carmine@strgillturner.com

Ben Carter
Jackson Cooper
Kentucky Equal Justice Center
201 West Short Street, Suite 310
Lexington, KY 40507
ben@kyequaljustice.org
jackson@kyequaljustice.org

Michelle Kanter Cohen
Beauregard William Patterson
Fair Elections Center
1825 K Street NW, Suite 701
Washington, DC 20006
mkantercohen@fairelectionscenter.org
bpatterson@fairelectionscenter.org

                                                           */s/ R. Kent Westberry*